**DELAWARE VALLEY CITIZENS' COUNCIL FOR CLEAN AIR, et al.**

v.

**COMMONWEALTH OF PENNSYLVANIA, et al.**

**UNITED STATES of America**

v.

**COMMONWEALTH OF PENNSYLVANIA, et al.**

Civ. A. Nos. 76–2068, 77–619.

United States District Court, E. D. Pennsylvania.

Jan. 22, 1982.

tive sanctions. *See* Executive Order No. 12,-065, § 5–502.

Jerome Balter, James S. Lanard, Philadelphia, Pa., for Delaware Valley Citizens' Council for Clean Air et al.

Carol E. Dinkins, Stephen D. Ramsey, Washington, D.C., for United States of America.

Ward T. Williams, John M. Hrubovcak, Harrisburg, Pa., for Commonwealth of Pennsylvania Dept. of Transp.

Kenneth A. Gelburd, Asst. Atty. Gen., Philadelphia, Pa., for Commonwealth of Pennsylvania Dept. of Environmental Resources.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

These two consolidated cases arose under the Clean Air Act, as amended, 42 U.S.C. § 7401, et seq. On August 29, 1978, the Commonwealth of Pennsylvania ("Commonwealth") and two of its administrative agencies voluntarily entered into a consent decree with the United States of America ("United States") and the Delaware Valley Citizens' Council for Clean Air ("DVCCCA"). In that consent decree, the Commonwealth defendants agreed to establish an automobile emissions inspection and maintenance program ("I/M program") for the Philadelphia and Pittsburgh areas. On October 5, 1981, the Pennsylvania General Assembly enacted a statute prohibiting the expenditure of public funds for the establishment of the I/M program. Presently before the Court are the motion of the Commonwealth defendants for a stay and a modification of the consent decree and the motion of the DVCCCA to declare defendants in civil contempt and to establish sanctions, both filed as a result of the General Assembly's action.

I.

Section 110 of the Clean Air Act requires each state to submit a state implementation plan ("SIP") for the attainment and maintenance of national ambient air quality standards for each air quality control region in that state. 42 U.S.C. § 7410. Originally, § 110(a)(2)(G) of the Act provided that a state *could* include an I/M program in its SIP "to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards" if so desired. 42 U.S.C. § 7410(a)(2)(G). On January 27, 1972, the Pennsylvania SIP was submitted to the United States Environmental Protection Agency ("EPA") for formal approval. 40 C.F.R. § 52.2020(b). On April 13, 1973, Pennsylvania submitted for EPA approval a Transportation Control Plan for the Metropolitan Philadelphia and Southwest Pennsylvania Air Quality Control Regions as a revision to the Pennsylvania SIP.[1] 38 Fed. Reg. 10120 (1973). The Pennsylvania Transportation Control Plan included provisions for an I/M program in order to meet federal air quality control standards in the Philadelphia and Pittsburgh areas. On November 28, 1973, the EPA promulgated a revised Transportation Control Plan for the Metropolitan Philadelphia and Southwest Pennsylvania Air Quality Control Regions to correct certain deficiencies contained in

---

1. The Pennsylvania portion of the Metropolitan Philadelphia Air Quality Control Region and the Southwest Pennsylvania Air Quality Control Region include counties not included within the scope of the consent decree. Although the difference does not affect the legal issues raised in our discussion, it has been preserved in our discussion for the sake of accuracy.

the Pennsylvania plan pursuant to its rule-making authority under the Clean Air Act. 38 Fed.Reg. 32884 (1973). Pursuant to this revision, the Pennsylvania SIP required the Commonwealth to implement an I/M program for the Philadelphia and Pittsburgh areas by May 1, 1975. 40 C.F.R. § 52.2038.[2]

The Commonwealth filed a petition to review the actions of the Administrator of the EPA in the promulgation of the revised Transportation Control Plan with the Third Circuit Court of Appeals pursuant to § 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b). *Commonwealth of Pennsylvania v. EPA*, 500 F.2d 246, 249 (3d Cir. 1974). Interestingly enough, the Commonwealth did not challenge the I/M program provisions in its petition for review. Rather, the Commonwealth challenged the validity of the EPA requirement mandating that air bleed retrofit devices be installed on all pre-1968 light-duty motor vehicles in the Metropolitan Philadelphia Air Quality Control Region and the Allegheny County portion of the Southwest Pennsylvania Air Quality Control Region. *See* 40 C.F.R. § 52.2039. The Third Circuit, in reviewing the Administrator's actions, set aside the air bleed retrofit requirement for the Allegheny County portion of the Southwest Pennsylvania Air Quality Control Region and affirmed the validity of the remainder of the Pennsylvania Transportation Control Plan. 500 F.2d at 263.

The I/M program was never implemented by the Commonwealth. On June 29, 1976, DVCCCA instituted a citizen's action, pursuant to 42 U.S.C. § 7604, against the Commonwealth of Pennsylvania, the Secretary of the Pennsylvania Department of Transportation ("PennDOT"), the Secretary of the Pennsylvania Department of Environmental Resources ("PennDER"), and the Administrator and Regional Administrator of the EPA to enforce the Pennsylvania

SIP requirement for the implementation of an I/M program in the Philadelphia and Pittsburgh areas. On September 23, 1976, the EPA issued notices of violation to the Governor of Pennsylvania and the Secretary of PennDOT, pursuant to § 113(a)(1) of the Clean Air Act, as amended, 42 U.S.C. § 7413(a)(1), because of Pennsylvania's failure to implement the I/M program by May 1, 1975. On February 18, 1977, the United States instituted its own suit against the Commonwealth of Pennsylvania and certain of its departments and officers, pursuant to § 113(b) of the Clean Air Act, as amended, 42 U.S.C. § 7413(b), to enforce the Pennsylvania SIP requiring the implementation of an I/M program.[3]

Meanwhile, on August 7, 1977, Congress passed the Clean Air Act Amendment of 1977, Pub.L.95–95, tit. I–IV, 91 Stat. 685. This amendment added a new Part D to the Clean Air Act requiring states to submit revised SIPs for areas which had not yet attained the national ambient air quality standards. 42 U.S.C. § 7501 *et seq.* These revised SIPs must meet specific requirements outlined in Part D of the Act and must provide for attainment of national ambient air quality standards by December 31, 1982. If a state cannot attain certain air quality standards in certain areas by December 31, 1982, § 172(a)(2) of the Act allows the EPA to grant an extension of the attainment deadline to December 31, 1987. 42 U.S.C. § 7502(a)(2). In the event that such an extension is granted, a state is required by § 172(b)(11) to submit "a specific schedule for implementation of a vehicle emission control inspection and maintenance program" in any area with an extended attainment deadline. 42 U.S.C. § 7502(b)(11).

On August 29, 1978, after extensive negotiations, the Commonwealth of Pennsylvania, and two of its departments, PennDOT

---

2. The purpose of an I/M program is to reduce emissions for in-use vehicles by identifying vehicles that need emission control related maintenance and requiring that such maintenance be performed. 40 C.F.R. § 52.2038. Three air pollutants—carbon monoxide, hydro carbons,

and photo-chemical oxidants—are largely attributable to motor vehicle emissions.

3. After the United States filed its own action against the Commonwealth and its agencies, DVCCCA dropped the Administrator and Regional Administrator as defendants in its suit.

and PennDER, voluntarily entered into a consent decree with both the DVCCCA and the United States by agreeing to implement an I/M program for ten counties in the Philadelphia and Pittsburgh areas by August 1, 1980.[4] Under the consent decree, the "Philadelphia Area" has been defined as Philadelphia, Bucks, Montgomery, Chester and Delaware Counties, paragraph 3(F) of the Consent Decree; while the "Pittsburgh Area" has been defined as Allegheny, Beaver, Butler, Westmoreland and Washington Counties, paragraph 3(G) of the Consent Decree. On March 7, 1980, the Court approved a modification of the August 29, 1978 consent decree which postponed the date of implementation to May 1, 1981. On May 20, 1980, the EPA granted Pennsylvania's extension requests for the Philadelphia, Pittsburgh, Allentown-Bethlehem-Easton, and Scranton-Wilkes-Barre areas pursuant to § 172(a)(2) and approved the submitted revised SIP which established an I/M program for these areas. 42 Fed.Reg. 33607 (1980).[5] On May 20, 1981, the Court denied the Commonwealth's motion for a

---

4. Commonwealth defendants first agreed to seek enabling legislation from the Pennsylvania General Assembly for a franchise system in implementing an I/M program for the Philadelphia and Pittsburgh areas. However, as agreed in the consent decree, a private garage system would be implemented instead in carrying forth the implementation of an I/M program in the event that the enabling legislation for a franchise system was not enacted by the Pennsylvania General Assembly on or before July 1, 1979. The enabling legislation for a franchise system was never enacted by the Pennsylvania General Assembly. The authority of defendants to enter into the consent decree seems clear. In 1972, the Pennsylvania General Assembly passed an amendment to the Vehicle Code which authorized PennDOT to establish an I/M program:

Section 834. Official Inspections.—
(a) Every owner of a motor vehicle (including a commercial motor vehicle, motor bus, motor omnibus, truck tractor, trailer, or semi-trailer having a chassis and body weight of less than one thousand (1000) pounds, or bicycle with motor attached, or fertilizer trailer), being operated in this Commonwealth, shall submit such motor vehicle to such inspection of its mechanism and equipment as may be designated by the secretary, *including such emission control systems and devices for which the Secretary of Transportation, in consultation with the Secretary of Environmental Resources, has adopted inspection procedure and requirements which shall, to the extent possible and practical, be consistent with the requirements of the "Clean Air Act" (77 Stat. 392, 42 U.S.C. 1857) and any amendments and supplements thereto. These requirements shall not apply within ninety (90) days after they are adopted, shall not be changed oftener than once a year and shall apply only to those motor vehicles as are required by Federal law or regulation to be equipped with such emission control systems and devices. The inspection of such devices and systems shall commence on the first day of the inspection periods (1) and (2) following the adoption of such standards by the secretary: Provided, however, That the secretary may provide that the inspection of such devices and systems may commence on the first day of the inspection period next following.*

. . . . .

Act of June 16, 1972, No. 154, § 1, 1972 Pa. Laws 480 (formerly codified at Pa.Stat.Ann. tit. 75, § 834). The Pennsylvania General Assembly later passed a new vehicle code, effective July 1, 1977, which amended the old vehicle code by revising, compiling and codifying provisions relating to vehicles and pedestrians. Act of June 17, 1976, No. 81, § 1, 1976 Pa.Laws 162 (presently codified at 75 Pa.C.S.A. §§ 101–8122). This enactment specifically repealed the old vehicle code, Act of April 29, 1959, No. 32, 1959 Pa.Laws 58, which had been amended in 1972. Act of June 17, 1976, No. 81, § 7(a). Pursuant to the recodification, this Court has concluded that PennDOT has retained the authority to implement an I/M program as part of its broadly defined power to "establish a system of semi-annual inspection of vehicles registered in this Commonwealth." *See* 75 Pa.C.S.A. § 4702(a). This retained power to implement an I/M program can also be implied from 75 Pa.C.S.A. §§ 4531, 4701–4702, 6103, and the fact that the General Assembly has never expressly revoked the authority of PennDOT to establish such a program. Nevertheless, the authority of PennDOT to establish such an I/M program is presently being challenged in *Burd v. Commonwealth of Pennsylvania Department of Transportation*, No. 1506 C.D.1981 (Pa. Cmwlth.Ct.) and *Scanlon v. Commonwealth of Pennsylvania Department of Transportation*, No. 1762 C.D.1981 (Pa.Cmwlth.Ct.) before the Pennsylvania Commonwealth Court.

5. The I/M program submitted by the Commonwealth, and subsequently approved by the EPA, incorporated the provisions of the August 29, 1978 consent decree with respect to the Philadelphia and Pittsburgh areas. Moreover, the Commonwealth also agreed to apply the provisions of the consent decree to the Allentown-Bethlehem-Easton and Scranton-Wilkes-Barre areas. This case presently before the Court only involves the issue of the enforce-

further modification and postponement of the implementation deadline and ordered that the I/M program commence operations "without further delay." *Memorandum and Order* (May 20, 1981). In its order, the Court declared the Commonwealth to be in violation of the consent decree and directed the Commonwealth to file, by June 1, 1981, a proposed plan for the immediate implementation of the I/M program in the Philadelphia and Pittsburgh areas. On June 16, 1981, the Court denied the Commonwealth's motion for reconsideration and approved a Court modified version of the Commonwealth's Proposed Emission Inspection and Maintenance Program I to commence operations on May 1, 1982. *Memorandum and Order* (June 16, 1981).

Following the Court's decision in June, 1981, the Pennsylvania General Assembly passed House Bill No. 456, § 2 ("H.B. 456"), which prohibited the expenditure of state funds by the executive branch for the implementation of the I/M program. On July 10, 1981, the Governor of Pennsylvania vetoed H.B. 456 and returned it to the General Assembly. Nevertheless, on October 5, 1981, the General Assembly overrode the Governor's veto and enacted H.B. 456 into law as an amendment to the Administrative Code of 1929. Section 2 of H.B. 456 provides:

> Section 2013. *Prohibition on Expenditures for Emission Inspection Program* Neither the department nor any other department or agency of the Executive Branch of State Government shall expend any public funds for the establishment and administration of any system for the periodic inspection of emissions or emission system of motor vehicles.

Act of October 5, 1981, No. 99, § 2, 1981 Pa.Legis.Serv. 312 (to be codified at Pa. Stat.Ann. tit. 71, § 523). PennDOT and the executive branch immediately ceased operations in the implementation of the I/M program following the passage of this law. Nevertheless, on October 10, 1981, final reg-

ment of the consent decree with respect to the Philadelphia and Pittsburgh areas as defined by

ulations pertaining to the standards for the emission analyzers to be purchased by the private garage owners wishing to participate in the I/M program were published in the Pennsylvania Bulletin. 11 Pa.Bull. 3519 (Oct. 10, 1981). Moreover, $36,118,000.00 had previously been appropriated without restriction by the General Assembly to PennDOT "for the salaries, wages and all necessary expenses for the administration of the traffic safety program and the administration and operation of the operator and vehicle registration programs." The current law prohibits the expenditure of these appropriated funds for the implementation of the I/M program agreed to by the Commonwealth when it entered into the consent decree. On December 2, 1981, a notice of deficiency was issued to the Commonwealth by the EPA because of the lack of funding assurances required by sections 172(b)(7) and 110(a)(2)(F) under the Clean Air Act due to the passage of H.B. 456. 46 Fed.Reg. 58593 (1981).

## II.

Presently before the Court are two motions: (1) the motion of state defendants, Commonwealth of Pennsylvania and PennDOT, for a stay and a modification of the consent decree, and (2) the motion of DVCCCA to declare the defendants in civil contempt and to establish sanctions. In addition, in response to the Court's Order of October 20, 1981, the United States has filed a brief taking the position that defendants' motion for a stay and a modification should be denied and that the Court should postpone a ruling on the motion for civil contempt and defer to the EPA for the initiation of administrative procedures and remedies available under the Clean Air Act, 42 U.S.C. § 7401, *et seq.* We will now address each parties' contentions.

## A.

The Commonwealth urges the Court to stay further implementation of the I/M

the consent decree.

program until such time that the Pennsylvania legislature decides to fund the program. Defendants argue that since H.B. 456 prohibits the expenditure of public funds for the implementation of an I/M program, the executive branch is now disabled from complying with the requirements of the consent decree and the Court's orders despite its continued willingness to do so. *See generally Shapp v. Sloan*, 480 Pa. 449, 391 A.2d 595 (1978). Moreover, defendants argue that the legislature's passage of H.B. 456 constitutes "changed circumstances" which warrant a stay or modification of the consent decree.

■ Paragraph 13 of the August 29, 1978 consent decree specifically provides:

Jurisdiction is retained by this Court for the purpose of enabling any party to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for carrying out of this Consent Decree, *for the modification or termination of any of the provisions herein upon a showing of changed circumstances and good cause*, or for the enforcement of compliance therewith and the punishment of violations thereof.

(Emphasis added). Indeed, even in the absence of such a clause, a federal district court may, in its discretion, modify a consent decree in the interests of justice as reflected by changed circumstances. *Mayberry v. Maroney*, 529 F.2d 332, 335 (3d Cir. 1976). Nevertheless, in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), the Supreme Court stated that a modification of a consent decree would only be appropriate where the decree "has been turned through changing circumstances into an instrument of wrong," *id.* at 115, 52 S.Ct. at 462; and that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed by years of litigation with the consent of all concerned." *Id.* at 119, 52 S.Ct. at 464. ■ A party should not be permitted, however, to obtain a modification of a consent decree because of changed circumstances of its own creation. *See Mayberry*

*v. Maroney*, 558 F.2d 1159, 1164 (3d Cir. 1977). This is especially true where the change in circumstances does not render continued compliance with the consent decree oppressive, but merely a party's act disabling itself from carrying out its part of its own judicially sanctioned agreement. Such "changed circumstances" simply do not fall within the realm of those recognized by courts in the past. *See e.g. System Federation v. Wright*, 364 U.S. 642, 647, 648, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961) (change in Railway Labor Act to permit union shops justified modification of a consent decree which enjoined discrimination against non-union employees); *Jordan v. School District*, 548 F.2d 117, 122 (3d Cir. 1977) (modification of consent decree justified where subsequent Supreme Court decision gave students greater rights than provided for in decree); *Theriault v. Smith*, 523 F.2d 601 (1st Cir. 1975) (vacation of consent decree based on interpretation of law that is rendered incorrect by later Supreme Court decision). As the Third Circuit has stated, "[t]here must be an end to litigation someday, and such free, calculated, deliberate choices are not to be relieved from." *Mayberry v. Maroney, supra*, at 1164. In this case, since there has been no change in the Clean Air Act or the caselaw upon which the present consent decree rests, the motion of the Commonwealth will be denied.

### B.

Next, the United States contends that the Court should defer to the EPA to allow for the initiation of administrative procedures and remedies available to the EPA under the Clean Air Act where, as here, a SIP is deficient, before deciding the questions of constitutionality and contempt raised by the Pennsylvania General Assembly's passage of H.B. 456 prohibiting the expenditure of public funds for the implementation of the I/M program. Pursuant to the Act, the EPA can impose a moratorium on all future construction or modification of major stationary sources of pollution, *see* 42 U.S.C. §§ 7410(a)(2)(I) and

7503(4), and withhold future Clean Air Act planning and pollution control funds. *See* 42 U.S.C. § 7506(b). *See generally United States v. Ohio Department of Highway Safety,* 635 F.2d 1195, 1202 (6th Cir. 1980), *cert. denied,* 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981). Nevertheless, the United States concedes that "[i]n the event the Commonwealth does not recommence implementation of the I/M program as a result of the administrative action taken by EPA, this Court retains jurisdiction under the Consent Decree and Orders to consider appropriate remedies for noncompliance." *Memorandum of the United States in Response to Court's Order of October 20, 1981,* at 10. Thus, the United States argues that the Court should defer to the EPA because of the traditional deference accorded to an agency in its interpretation of the statute which it administers, *see Chrysler Corp. v. Environmental Protection Agency,* 600 F.2d 904, 913 (D.C.Cir.1979) and because the EPA has primary jurisdiction to take action which may obviate the necessity for judicial action. *See Far East Coast Conference v. United States,* 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952); *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–165, 1 L.Ed.2d 126 (1956). Thus, the United States essentially contests the Court's present jurisdiction over this dispute.

■ After considering these views, the Court holds that it is not required to defer to the EPA before taking action on the motions presently pending and that it has jurisdiction over the present dispute. First, the issues raised concern a consent decree which was voluntarily entered by the Commonwealth and two of its agencies after a citizens' action was filed in the district court by the DVCCCA pursuant to § 304(a) of the Clean Air Act, 42 U.S.C. § 7604(a), and an enforcement action was filed by the United States pursuant to § 113(b), 42 U.S.C. § 7413(b). The notion of primary jurisdiction does not apply where the parties have already properly resorted to the remedies available in the federal district court and have entered a consent decree in

settlement of their dispute. Of course, judicial action to enforce the consent decree does not prevent the EPA from taking contemporaneous administrative action, where authorized, to enforce compliance. Nevertheless, where, as here, the parties are already properly, lawfully and voluntarily before the Court as parties to the consent decree, no purpose would be served by deferring to an administrative agency. Accordingly, the Court declines to adopt the suggestion of the United States.

### C.

The Court now turns to the motion of plaintiff DVCCCA to declare the defendants in civil contempt and to establish sanctions. DVCCCA's motion essentially seeks four items of relief: (1) a declaration that defendants are in civil contempt for failure to comply with the modified consent decree and the Court's orders of May 20 and June 16, 1981; (2) a declaration that § 2 of H.B. 456 is unconstitutional and without effect; (3) an order directing defendants forthwith to comply with the modified consent decree and the Court's orders; and (4) the establishment of coercive and compensatory civil penalties, primarily consisting of fines of $50,000.00 per day for continued violations. The first two items of relief sought raise substantive legal questions. The remaining items are merely matters of remedy which must be addressed only if the Court first holds that defendants are in civil contempt, and then only to determine whether they constitute appropriate relief. Therefore, the Court will begin by addressing DVCCCA's first two items of requested relief.

### 1. *Constitutionality of H.B. 456.*

■ Plaintiff DVCCCA argues that H.B. 456 violates the Supremacy Clause of the Federal Constitution, U.S.Const., art. VI, cl. 2, in two respects: first, by having the effect of nullifying the Court's orders and the consent decree; and secondly, by directly conflicting with the requirements of the

Clean Air Act, 42 U.S.C. § 7401 *et seq.*[6] Upon full consideration, the Court has concluded that H.B. 456 cannot be declared unconstitutional on either ground.

#### a. Interference with a Consent Decree.

■ It is well settled that a state law which purports to nullify or prevent compliance with a federal judicial decree is unconstitutional and without effect. *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 692–696, 99 S.Ct. 3055, 3077–3080, 61 L.Ed.2d 823 (1976); *Cooper v. Aaron*, 358 U.S. 1, 18–19, 78 S.Ct. 1401, 1409–10, 3 L.Ed.2d 5 (1958); *Ableman v. Booth*, 62 U.S. (21 How.) 506, 523–524, 16 L.Ed. 169 (1858); *United States v. Peters*, 9 U.S. (5 Cranch) 115, 136, 3 L.Ed. 53 (1809). Moreover, by preventing the Commonwealth defendants from fulfilling their obligations under the consent decree, H.B. 456 clearly interferes with the realization of a federal judicial decree. Nevertheless, there are serious limits not reached by the cases cited above on the power of the federal government to require action on the part of state government. The Supreme Court has held that Congress, in enacting legislation otherwise within its authority, may not impose burdens on states which impair essential attributes of state sovereignty. *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). This principle is not only embodied in the language of the Tenth Amendment, but is also implicit in the concept of federalism underlying the structure of our government.

■ This concept and its effect on the power of a federal court to interfere with the appropriation decisions of a state legislature were recently discussed in *New York State Association for Retarded Children v. Carey*, 631 F.2d 162 (2d Cir. 1980). In *Carey*, a consent decree was entered in which Governor Carey agreed to make specific budget requests to the state legislature for a Review Panel designed to improve conditions for mentally retarded residents at the Willowbrook Developmental Center on Staten Island. The state legislature refused to provide the necessary funding for the Review Panel. Reversing a district court order holding Governor Carey to be in contempt, the Second Circuit stated:

> We have previously held, and repeat here, that a federal district court ought not to put itself "in the difficult position of trying to enforce a direct order ... to raise and allocate large sums of money ... steps traditionally left to appropriate executive and legislative bodies responsible to the voters." ... In the face of constitutional violations at a state institution, a federal court can order the state either to take the steps necessary to rectify the violations or to close the institution. Thus, a state cannot avoid the obligation of correcting the constitutional violations of its institutions simply by pleading fiscal inability.... But that remedy leaves the question of the expenditure of state funds in the hands of citizens of the state, not in the hands of federal judges.... Those organizations and citizens who are properly concerned with the supervision of the conditions at Willowbrook must seek to convince their representatives in the New York State Senate and Assembly, who control the purse-strings and determine the priorities for the expenditure of State money, that funds for the Review Panel should be provided.

631 F.2d at 165–66 (citations omitted). Although *Carey* did not so hold, the considerations set forth in Carey, as well as those discussed in the cases relied upon in the next section, lead the Court to conclude that a federal court on the present record lacks the power under our federalist system to countermand the decision of a state legislature not to expend state funds on the establishment of an I/M program.[7]

---

6. The Court also raised *sua sponte* the issue whether H.B. 456 constitutes an impairment of contract proscribed by article I, § 10 of the Federal Constitution. *See* note 9 *infra.*

7. The Court expresses no opinions as to whether there may be other programs which a state may be required by the Constitution or federal law to maintain and fund. Our holding in this regard is limited to the I/M program as embod-

b. Conflict with the Clean Air Act.

■ Plaintiff DVCCCA also claims that H.B. 456 is unconstitutional because it conflicts directly with the Clean Air Act, as amended. In particular, plaintiff DVCCCA relies upon those provisions of the Clean Air Act which require that a SIP provide for an I/M program where necessary. *See* 42 U.S.C. §§ 7410(b)(2)(G), 7502(b)(11)(B). Plaintiff argues that, since an I/M program is required under the Act, and H.B. 456 effectively prohibits the establishment of such a program, H.B. 456 is unconstitutional. The Courts of Appeals of several circuits have considered this argument, however, and the majority have concluded that the Clean Air Act does not require states to establish and fund I/M programs or authorize the EPA to so require. *See Brown v. EPA (Brown II)*, 566 F.2d 665, 668–672 (9th Cir. 1977); *Maryland v. EPA*, 530 F.2d 215, 227–228 (4th Cir. 1975), *vacated* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977); *District of Columbia v. Train*, 521 F.2d 971, 983–988 (D.C.Cir.1975), *vacated*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977); *Brown v. EPA (Brown I)*, 521 F.2d 827, 832–837 (9th Cir. 1975), *vacated*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977). Indeed, those same opinions suggest that Congress lacks the power to do so because of the Tenth Amendment and principles of federalism. *See Brown II, supra*, at 672–673; *Maryland v. EPA, supra*, at 224–226; *District of Columbia v. Train, supra*, at 990–995; *Brown I, supra*, at 837–842. The Court agrees with the cases cited, and accordingly concludes that H.B. 456 does not conflict with the Clean Air Act, as amended.

Plaintiff DVCCCA relies heavily on the decision of the Court of Appeals for the Sixth Circuit in *United States v. Ohio Department of Highway Safety*, 635 F.2d 1195 (6th Cir. 1980). A close reading of the facts of the case, however, show that the case is distinguishable from the case at bar. In *Ohio Department of Highway Safety*, two counties established emission inspection programs pursuant to federal regulations.

Contrary to federal regulations, however, the state refused to deny registration to vehicles that failed the inspection. The only question before the Court of Appeals was whether the state could be compelled to deny registration to noncomplying vehicles. In holding that it could, the court found no constitutional barrier in the Tenth Amendment. As the court noted,

> The regulation which EPA seeks to enforce does not require the State to adopt legislation, establish new regulatory agencies or change its procedures for registering vehicles. It merely requires the State to deny use of state-owned facilities to those whose use adds to the national problem of pollution. Further it does not appear that compliance will entail large expenditures by the State.

635 F.2d at 1205. Thus, unlike the present case, *Ohio Department of Traffic Safety* did not involve state legislative attempts to control the institution of the inspection program.

Moreover, the Court does not believe that it is bound by the suggestion made by the Third Circuit Court of Appeals in *Commonwealth of Pennsylvania v. EPA*, 500 F.2d 246, 259–263 (3d Cir. 1974), that the federal government could constitutionally require the states to pass legislation establishing a regulatory program to enforce the Clean Air Act. In the first place, the court was not faced with a legislative refusal to comply. Moreover, the court was without the benefit of the Supreme Court's subsequent decision in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which was the first Supreme Court decision to hold on the merits that the Tenth Amendment carried substantive force.

■ For these reasons, the Court holds that H.B. 456 cannot be declared unconstitutional because of the Tenth Amendment prohibitions on the reach of the Commerce Clause and legislation enacted pursuant to that provision.[8]

---

ied in the consent decree and contemplated by the Clean Air Act.

**8.** At the November 20, 1981 hearing, the Court raised *sua sponte* the question whether H.B.

880

### 2. *Motion for Civil Contempt.*

#### a. Defendants' Conduct as Contempt.

 It is well established that a consent decree, although negotiated by the parties, is a judicial act. *United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). A party violating a consent decree is therefore subject to the powers by which a court protects its judgments, including, most notably, the power of contempt under 18 U.S.C. § 401 (1976). *See Interdynamics, Inc. v. Wolf*, 653 F.2d 93, 96–97 (3d Cir. 1981). Punishment by fine or imprisonment may also be imposed where a court finds that a party is in civil contempt in order to coerce the recalcitrant party into compliance with the Court's orders. *Cromaglass Corporation v. Ferm*, 500 F.2d 601, 604 (3d Cir. 1974). Moreover, a broad range of equitable powers are available to a court to enforce and effectuate its orders and judgments. *United States v. City of Detroit*, 476 F.Supp. 512, 520 (E.D. Mich.1979).

In this case, the Commonwealth of Pennsylvania with a full range of technical and professional guidance and representation at its disposal entered, after considerable opportunity for deliberation and negotiation, into a consent decree in which it agreed to implement an I/M program in the Philadelphia and Pittsburgh areas under the terms and conditions of that decree. On May 20, 1981, the Court denied the Commonwealth's motion for a further modification and postponement of the implementation date and ordered that the program commence "without further delay." *Memorandum and Order* (May 20, 1981). On June 16, 1981, the Court approved a modified plan submitted by the Commonwealth for the implementation of the I/M program to commence on May 1, 1982. *Memorandum and Order* (June 16, 1981). Since then, the Pennsylvania legislature has enacted H.B. 456 which prohibits state expenditures for the implementation of the I/M program as previously promulgated and implemented by PennDOT pursuant to its legislatively conferred authority. *See* note 4, *supra*. As a result, the Commonwealth and its agencies are no longer fulfilling their obligations under the consent decree.

 It is well settled that civil contempt consists of a party's failure to comply with a judicial order where the party has knowledge of the order and the ability to comply. *See United States Steel Corp. v. United Mine Workers of America*, 393 F.Supp. 942, 947 (W.D.Pa.1975). It is not necessary to establish that the noncomplying party acted willfully. *N.L.R.B. v. Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 428 F.2d 994, 1001 (2d Cir. 1970). In this case, there is no doubt that the Commonwealth defendants are no longer complying with the consent decree. The defendants themselves admitted, that with the passage of H.B. 456, they had discontinued all efforts to implement an I/M program, save for publishing regulations regarding the analyzers to be used. Similarly, there is no doubt that the Commonwealth defendants had knowledge of the consent decree. Finally, it is also clear that the Commonwealth has the ability to comply with the decree in the sense necessary to hold a party in civil contempt. That the

456 constituted an unconstitutional impairment of the contract embodied in the consent decree, and requested supplemental briefs on that issue. After thorough consideration, the Court has concluded that H.B. 456 cannot be invalidated on this ground. Assuming *arguendo* that the contractual nature of a consent decree as established in the caselaw, *see e.g., United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n.10, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975), is sufficient to receive the protection of the Contract Clause, the Court would nevertheless be compelled to conclude from the radical effect of H.B. 456 that the legislature's action represents not an impairment of contract but an election to breach, releasing the Commonwealth defendants from their obligations and entitling the plaintiffs to a remedy. *See Hays v. Port of Seattle*, 251 U.S. 233, 40 S.Ct. 125, 64 L.Ed. 243 (1920); Hale, *The Supreme Court and the Contract Clause: II*, 57 Harv.L.Rev. 621, 638 (1944). In this case, where there is clearly no adequate remedy at law and specific performance would be barred by the same considerations of federalism discussed in the text, *supra*, the Court would fashion the same remedy for the breach as that chosen as its sanction for the defendants' contempt. *See infra*.

Commonwealth has sufficient resources of money and manpower to carry out the consent decree is demonstrated by the fact that the Commonwealth, through both legislative authorization and administrative action, approved and funded the implementation of an I/M program for several years prior to the enactment of H.B. 456. Thus, it is clear that it is and always has been physically, practically, and financially able to comply with the consent decree. Nor is there any legal barrier to the implementation of the consent decree other than H.B. 456. In this regard, it is important to note that H.B. 456 is not a legal disability imposed upon the Commonwealth from without; rather, it is a disability imposed from within the sovereignty itself reflecting a decision of the legislative arm of that government that the I/M program shall not go forward as agreed to by the executive arm even though that very executive arm had previously been lawfully empowered to enter into the program by that same legislative arm.

In this regard, the Court cannot accept the Commonwealth defendants' argument that for the purposes of the present proceeding the conduct of the state's executive branch should be considered separately from that of its legislative branch. At least with regard to the establishment of inspection programs, the threshold power in Pennsylvania over the creation and scope of such programs is exercised not by the executive, but by the legislature. It was pursuant to the exercise of such authority that PennDOT was and still is authorized to promulgate regulations necessary to establish inspection programs complying with the Clean Air Act. See note 4, supra. In the same manner, in signing the consent decree in this case, the Commonwealth defendants were only exercising the authority granted

to them by the legislature. However, through the passage of the funding restrictions imposed by H.B. 456, the Commonwealth defendants have been prohibited, by legislative directive, from implementing the same I/M program that they had previously been urged and authorized to enter into in the form of the consent decree. In the area covered by the consent decree, the executive branch merely is obligated to carry forward the will of the sovereign as that will has been previously expressed by the legislature. It is of no legal significance that individual members of the executive branch have the subjective desire to fulfill each and every one of their undertakings in the decree. It is of more importance to the Court, in determining whether the Commonwealth defendants are now in contempt, to determine what the conduct of the defendants is in light of the laws those defendants exist to implement, including H.B. 456. As a result of the passage of H.B. 456, the Commonwealth (by its legislative arm) has prevented itself (through its executive arm) from being able to comply with the provisions of the consent decree that it once properly and lawfully entered into. The Commonwealth of Pennsylvania and its two agencies are party defendants. The fact that these defendants that are before the Court have been prevented by a part of the Commonwealth that is not before the Court from carrying out the decree does not insulate the parties before the Court from the consequences of a self-imposed failure to fulfill the obligations of the judgment that is before the Court and represented by the decree. Accordingly, the Court finds that the Commonwealth of Pennsylvania and the other Commonwealth defendants that are part of that Commonwealth are in civil contempt for failing to comply with the judgment of the Court.[9]

9. Defendants rely heavily on *New York State Association for Retarded Children v. Carey*, 631 F.2d 162 (2d Cir. 1980) for the proposition that a federal court cannot hold a state defendant in civil contempt when the state legislature refuses to appropriate monies for a program mandated by a consent decree. The *Carey* case is readily distinguishable, however, from the facts

of our case. In *Carey*, the Governor of New York had agreed to seek state funding for a Review Panel for the purpose of improving conditions at a state developmental center for mentally retarded residents. In that case, the execution branch had never been authorized by the state legislature to pursue such a program. The facts in our case are directly opposite to

b. The Appropriate Remedy.

■ Having determined the Commonwealth defendants to be in civil contempt of the consent decree, the Court must decide upon an appropriate remedy, bearing in mind that a sanction for civil contempt should be designed either to coerce the contumacious party into compliance, or to compensate the aggrieved party for loss, if any, or for both purposes. *Latrobe Steel Co. v. United Steelworkers of America, AFL–CIO*, 545 F.2d 1336, 1344 (3d Cir. 1976). Moreover, in fashioning a coercive remedy, the district court, sitting in equity, is vested with wide discretion. *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979). *See also United States v. City of Detroit*, 476 F.Supp. 512 (E.D.Mich.1979) (appointment of receiver for Detroit waste water system after court declaration that city was in violation of a consent decree). In addition, the remedy chosen in the present case should avoid undue interference with essential elements of state sovereignty for the reasons discussed earlier in this opinion.

■ A remedy that appears to meet the present need is suggested by the Clean Air Act itself. In the 1977 amendments to the Act, Congress sought to induce states to establish I/M programs by including provisions which, if invoked, could lead to the termination of certain related federal benefits. Most important among these federal funds are those for highway construction. It was for this purpose that Congress enacted, as one means of inducement, section 176(a) of the Act, which provides in relevant part:

(a) The Administrator shall not approve any projects or award any grants authorized by this chapter and *the Secretary of Transportation shall not approve any projects or award any grants under Title 23 other than for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance, in any air quality control region—*

(1) in which any national primary ambient air quality standard has not been attained.

(2) where transportation control measures are necessary for the attainment of such standard, and

(3) *where the Administrator finds after July 1, 1979, that the Governor has not submitted an implementation plan which considers each of the elements required by section 7502 of this title or that reasonable efforts toward submitting such an implementation plan are not being made (or, after July 1, 1982, in the case of an implementation plan revision required under section 7502 of this title to be submitted before July 1, 1982).*

42 U.S.C. § 7506 (emphasis added). The coercive purpose of section 176(a) is clear from the legislative history of the 1977 amendments.

In reporting on a committee proposal, the Committee on Interstate and Foreign Commerce made the following statement:

Once the I/M program has become part of an "applicable implementation plan" (whether by State adoption and EPA approval or by promulgation of the Administrator), then enforcement and implementation can occur in several possible ways. More preferably, the State may agree voluntarily to implement and enforce the I/M program. Other options include (1) *inducing the State to do so, by offering grants under section 210 of the Act or by withholding part of a State program grant under section 105 of the Act or by such other means as have been held permissible by the Court in District of Columbia v. Train*, [521 F.2d 971 (D.C. Cir.1975)]; (2) delegating authority to

those of *Carey.* In our case, the state legislature had previously authorized the executive branch, here, PennDOT, to implement an I/M program in conformance with the federal Clean Air Act. *See* note 4, *supra.* Moreover, the program had been funded annually by the state legislature until the passage of H.B. 456 in

October, 1981. Therefore, the state legislature has attempted to revoke the authority of the executive branch to implement an I/M program by placing restrictions on state appropriations. The existence of prior legislative approval and funding for the consent decree distinguish this case from *Carey.*

general purpose local governments to implement and enforce the program under section 303 of the bill; (3) if feasible, providing for Federal implementation and enforcement of the program (including Federal licensing of private I/M centers, or turnkey operations, and imposing Federal inspection fees); or (4) seeking injunctive relief under section 113 of the Act; or (5) a combination of the above. It should be noted that the various mechanisms for obtaining voluntary compliance (e.g., withholding of program grants) are intended to provide alternatives to enforcement actions under section 113, thus allowing the Administrator to avoid compulsion where implementation of the necessary actions can be assured by other means.

H.Rep.No.95–294, *reprinted in* [1977] U.S. Code Cong. & Admin.News at 1077, 1369–70. *See also District of Columbia v. Train*, 521 F.2d 971, 993 n.26 (D.C.Cir.1975) ("The federal government traditionally obtains state cooperation and participation in federal regulatory programs by offering the states a sufficiently attractive incentive or by threatening to withdraw a federal benefit they are presently receiving."). Moreover, in discussing the Senate version of the 1977 amendments, Senator Muskie stated:

In view of the time that has elapsed since enactment of the 1970 amendments, it is regrettable that legal uncertainties have held up implementation of inspection and maintenance programs and other necessary measures. EPA's authority to promulgate transportation control measures requiring the States to take action, where necessary, and to compel compliance with such requirements, where necessary, is clear in sections 110 and 113 of existing law. Although this is a delicate area of Federal-State relations, it is appropriate to require affirmative State action in the field of transportation controls where this proves necessary to protect the public health.

By providing roads and highways that facilitate and encourage extensive use of motor vehicles, the States have played a substantial, if unintentional role in causing the pollution problems that result. And, as a practical matter, State and local governments are in a better position than EPA to attack those problems, which involve millions of motor vehicles, through inspection and maintenance programs and similar measures. In addition, the scheme contemplated by the act is a reasonable approach to this problem, one that is designed to involve the least possible intrusion into State affairs consistent with the task that is necessary. The 1970 amendments were carefully drawn to provide the States with maximum flexibility and discretion in developing plans under section 110 of the act, so long as the essential objective-attainment and maintenance of the national ambient air quality standards was met. Thus, the States may make the basic policy choices, if they wish in developing inspection and maintenance programs and similar measures: Federal promulgation is required only if the States default. For all these reasons, I hope that further progress in this area will not be stalemated by legal uncertainties, and I urge EPA to continue to press for implementation of the necessary programs.

*It should be noted that the various mechanisms provided to induce voluntary State implementation of approved or promulgated measures, such as cut-offs of highway funds for failure to implement such measures, are intended to provide alternatives to injunctive actions under section 113, thus allowing the Administrator to avoid compulsion where he believes that implementation can be assured by other means.*

123 Cong.Rec. § 9168 (1977) (emphasis added).

With the foregoing in mind, under the auspices of the Court's inherent equitable process, the Court will enjoin the United States Secretary of Transportation from approving any projects or awarding any grants to the Commonwealth of Pennsylvania for highway projects in the Philadelphia and Pittsburgh areas as defined in the consent decree, other than those grants re-

quired for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance in those same Philadelphia and Pittsburgh areas. In refusing to comply with the provisions of the consent decree through the passage of H.B. 456 which prohibits the expenditure of state funds for the implementation of an I/M program, Pennsylvania has indirectly but with calculated effectiveness rescinded the state SIP revisions submitted for the Philadelphia and Pittsburgh non-attainment areas as required under 42 U.S.C. § 7502. For this reason, Pennsylvania's adoption of H.B. 456 is tantamount to no SIP revision having ever been submitted before, which would, thus, trigger the invocation of the sanctions prescribed by Congress in 42 U.S.C. § 7506(a).[10] Moreover, this remedy, under all the circumstances, serves to promote the underlying goal of the consent decree and the philosophies behind the enactment of the Clean Air Act and subsequent amendments since the further construction of highways encourages the further use of motor vehicles which thereby results in an increase in air pollutants and a decrease in air quality. Finally, the aforementioned remedy will not interfere with state sovereignty since it permits the state's action to stand as long as the state chooses to remain adamant in its refusal to establish the I/M program it agreed to, while it also encourages the state to reconsider its position and comply with the consent decree.[11] For these reasons the Court is of the view that a cut-off of federal highway funds serves all of the Court's remedial objectives.

## III.

To summarize, the enactment of H.B. 456 by the Pennsylvania legislature does not constitute a change in circumstances warranting a stay of the consent decree, nor does it require the Court to defer to the EPA for the resolution of its effects. At the same time, the Court has concluded that there is nothing in the Federal Constitution which prohibits the state from enacting such a measure. Nevertheless, since the effect of H.B. 456 is that the Commonwealth defendants are no longer complying with the provisions of the consent decree of which they are parties, the Court holds that the defendants are in civil contempt. As a remedy, and as applied to the Philadelphia and Pittsburgh Areas covered by the decree, the Secretary of the United States Department of Transportation will be enjoined from approving and awarding grants of federal highway funds unless they are for safety, mass transit, or transportation projects related to air quality improvement and maintenance.

An appropriate Order will be entered.

## ORDER

AND NOW, TO WIT, this 22nd day of January, 1982, for the reasons expressed in the foregoing Memorandum, IT IS ORDERED as follows:

1. Defendants' motion to stay and to modify the consent decree is *denied*;

2. The motion of plaintiff Delaware Valley Citizens' Council for Clean Air to declare the defendants in civil contempt and to establish sanctions is *granted in part* and *denied in part* as follows:

a. The Commonwealth of Pennsylvania, the Secretary of the Pennsylvania Department of Transportation, and the Secretary of the Pennsylvania Department of Environmental Resources are hereby *declared* to be in *civil contempt*;

b. The Secretary of the United States Department of Transportation ("Secretary"), or his designee, *shall not approve* any projects *or award* any grants under Title 23 of the United States Code in the Philadelphia or Pittsburgh Areas, as those

10. Funding restrictions have already been imposed with respect to federal highway monies in California and Kentucky due to the states' failure to submit adequate SIP revisions for non-attainment areas as required under § 172 of the Clean Air Act. 45 Fed.Reg. 81746 (Dec. 12, 1980).

11. *Cf.* 5A *Corbin on Contracts* § 1138, at 106–107 (1964) (remedy for breach of contract).

areas are defined in ¶ 2(c)(vi) below, other than for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance, *see* 42 U.S.C. § 7506(a);

c. The Secretary, or his designee, *may approve* such projects *or award* such grants under Title 23 of the United States Code for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance in the Philadelphia or Pittsburgh Areas, as those areas are defined in ¶ 2(c)(vi) below, in any manner permitted by law; *provided* that the following additional requirements are fulfilled before any such approval or award becomes final:

(i) The Secretary, or his designee, *shall certify*, in writing, that the project approved or grant awarded is for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance in the Philadelphia or Pittsburgh Areas, as those areas are defined in ¶ 2(c)(vi) below;

(ii) The certificate required by ¶ 2(c)(i) above *shall specify* which of the excepted purposes are expected to be served by approval of the grant or award of the project;

(iii) The certificate required by ¶ 2(c)(i) above *shall contain* a brief statement of the factual grounds for the approval of the project or award of the grant and how said approval of the project or award of the grant is expected to serve the purpose or purposes set forth in the certification under ¶ 2(c)(ii) above;

(iv) The original copy of the certificate required under ¶ 2(c)(i) above shall be *filed* with the Court and copies *served* upon all counsel;

(v) The Secretary's approval of any project or award of any grant under the exception provided in ¶ 2(b) above shall become final *thirty (30) days* after the certificate required by ¶ 2(c)(i) above is filed and served, *unless*, within that time, the Court issues an Order staying the approval or award;

(vi) The *Philadelphia Area* shall consist of Philadelphia, Bucks, Montgomery, Chester and Delaware Counties; the *Pittsburgh Area* shall consist of Allegheny, Beaver, Butler, Westmoreland and Washington Counties; *see* Consent Decree ¶¶ 3(F), 3(G);

d. In all other respects, the motion of plaintiff Delaware Valley Citizens' Council for Clean Air to declare the defendants in civil contempt and to establish sanctions is *denied.*