DELAWARE VALLEY CITIZENS'
COUNCIL FOR CLEAN AIR,
et al.

v.

COMMONWEALTH OF PENNSYLVA-
NIA, et al.

UNITED STATES of America

v.

COMMONWEALTH OF PENNSYLVA-
NIA, et al.

Civ. A. Nos. 76–2068, 77–619.

United States District Court,
E.D. Pennsylvania.

Nov. 9, 1982.

See also, 3d Cir., 678 F.2d 470; D.C.,
533 F.Supp. 869.

Jerome Balter, James S. Lanard, Philadelphia, Pa., for Delaware Valley Citizens' Council for Clean Air et al.

Carol E. Dinkins, Stephen D. Ramsey, Washington, D.C., for United States of America.

Ward T. Williams, John M. Hruboucak, Harrisburg, Pa., for Commonwealth of Pennsylvania Dept. of Transp.

Kenneth A. Gelburd, Harrisburg, Pa., for Commonwealth of Pennsylvania Dept. of Environmental Resources.

## MEMORANDUM

BECHTLE, District Judge.

On August 29, 1978, the Commonwealth of Pennsylvania ("Commonwealth") and two of its administrative agencies voluntarily entered into a consent decree with the United States of America ("United States")

and the Delaware Valley Citizens' Council for Clean Air ("DVCCCA"). In that consent decree, the Commonwealth defendants agreed to establish an automobile emissions inspection and maintenance program ("I/M program") for the Philadelphia and Pittsburgh areas. On January 22, 1982, this Court found the Commonwealth in civil contempt for failing to implement the agreed upon I/M program. As part of its Order the Court imposed the following sanction:

> The Secretary of the United States Department of Transportation ("Secretary"), or his designee, *shall not approve* any projects *or award* any grants under Title 23 of the United States Code in the Philadelphia or Pittsburgh Areas, ..., other than for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance, see 42 U.S.C. § 7506(a);

*Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania,* 533 F.Supp. 869, 884–885 (E.D.Pa.1982). That Order was affirmed on appeal. 678 F.2d 470 (3d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 14, 73 L.Ed.2d 1400 (1982).

Presently before the Court is a request by the Commonwealth for approval of federal funding for seven projects in the Philadelphia and Pittsburgh areas. The seven projects for which exemptions are sought are as follows:

| Federal Project No. | Total Amt. of Project | Federal Funds | PennDOT Proposal Date | FHWA Approval Date | Basis of Exemption |
|---|---|---|---|---|---|
| PMS–GOOS(124) | $ 200,000 | $ 200,000 | 7/27/82 | 9/17/82 | Safety |
| PMS–OOS(128) | 888,000 | 888,000 | 7/27/82 | 9/17/82 | Safety |
| BRM–H014(1) | 8,232,000 | 6,585,600 | 9/1/82 | 9/24/82 | Safety |
| I–376–1(38)(0) | 45,745,025 | 41,027,764 | 9/20/82 | 9/24/82 | Safety |
| I–95–1(91)(14) | 46,306,384 | 41,675,744 | 9/22/82 | 9/23/82 | Safety & Air Quality |
| BRF–280(6) | 40,575 | 32,460 | 9/20/82 | 9/29/82 | Safety |
| SRS–2000(384) | 100,000 | 90,000 | 9/20/82 | 9/29/82 | Safety |
| | $101,511,984 | $90,499,568 | | | |

On November 4, 1982, a hearing was held at which time the Court entered an Order staying any future awards until further Order of Court. For the reasons which follow, the Court will approve Federal Project Nos. PMS–GOOS(124) and PMS–OOS(128), and deny approval for Federal Project Nos. BRM–H014(1), I–376–1(38)(0), I–95–1(91)(14), BRF–280(6), and SRS–2000(384).

### I.

On January 22, 1982, the Court entered its Order enjoining the award of federal highway funds to the Commonwealth as a sanction for the Commonwealth's failure to immediately implement an I/M program for the Philadelphia and Pittsburgh areas. Now the Commonwealth seeks to receive certain monies under the Court's express exceptions for safety and air quality improvement. Proper evaluations of the Commonwealth's present request requires scrutiny of the exceptions included in the Court's January 22, 1982 Order.

In framing the exceptions for safety and air quality improvement, the Court's purpose was to provide for prospective limited allowance for the funding of those certain projects which might arise and be necessary and principally intended to correct or improve existing safety hazards or existing air quality. In this way the Court sought to provide an exception which would protect the public from any unnecessary harm as a result of its Order. In order for a project to fall within the safety or air quality improvement exception in the context of considering an exemption to a contempt status, the Commonwealth has the burden of prov-

ing that the project's principal purpose is that of safety or air quality improvement.

The present sanction was patterned after section 176(a) of the Clean Air Act, 42 U.S.C. § 7506(a). That section provides in relevant part:

§ 7506. Limitations on certain Federal assistance

Approval of projects or award of grants

(a) *The Administrator shall not approve any projects or award any grants authorized by this chapter and the Secretary of Transportation shall not approve any projects or award any grants under Title 23 other than for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance, in any air quality control region—*

(1) in which any national primary ambient air quality standard has not been attained,

(2) where transportation control measures are necessary for the attainment of such standard, and

(3) *where the Administrator finds after July 1, 1979, that the Governor has not submitted an implementation plan which considers each of the elements required by section 7502 of this title or that reasonable efforts toward submitting such an implementation plan are not being made (or, after July 1, 1982, in the case of an implementation plan revision required under section 7502 of this title to be submitted before July 1, 1982).*

42 U.S.C. § 7506(a) (emphasis added). The term "safety improvement project" is defined under Title 23 of the United States Code as follows: "[T]he term 'highway safety improvement project' means a project which corrects or improves high hazard locations, eliminates roadside obstacles, improves highway signing and pavement marking, or installs traffic control or warning devices at high accident potential locations." 23 U.S.C. § 101(a). Moreover, the terms "safety" and "air quality improvement" were defined by the Environmental Protection Agency ("EPA") and the United States Department of Transporta-

tion ("DOT") in a joint policy statement which sets forth the policy and procedures for meeting the federal assistance limitations in section 176(a) of the Clean Air Act. EPA/DOT Policy, 45 Fed.Reg. 24696 (April 10, 1980). These definitions are considered as factors by the Court in determining whether under all of the circumstances the certified projects meet the purpose and intent of the Court's Order finding the Commonwealth defendants in contempt, with exceptions for some safety and air quality improvements. That is, while the Court is not bound by these definitions because the Court's sanction was found necessary and entered under the Court's inherent power and duty to fashion a relatively reasonable yet effective remedy in civil contempt, nevertheless, the definitions are useful as a guide in reviewing the defendants' application to the Court at this time.

 Under paragraph 2(c)(i) of the Court's Order of January 22, 1982, the Court imposed the requirement that the federal Secretary of Transportation, or his designee, certify in writing that any particular project approved or award granted be for safety or air quality improvement before any project or award could receive final approval by the Court as an exemption to the Court's January Order. 533 F.Supp. at 885. The certification requirement was imposed by the Court as a mechanism to preliminary screen those projects which the Commonwealth believed might fall under the safety or air quality improvement exceptions. The Court is not required to gauge the "certification" by the Secretary in accordance with the often used "arbitrary and capriciousness" test usually applied in evaluating the performance of a member of the executive branch whose actions are subject to judicial review. In order to determine the standard that the Court should apply to the Secretary's action, it is appropriate and indeed necessary to consider the source from which the authority to certify comes. In statutes enacted by the Congress where it is the intent of the Congress to construct and improve the highway system, it is clear that the intent

of the Congress in proffering the funds to do so through the Secretary, is to allow the Secretary to have the latitude and the discretion in the awarding of such funds to fulfill the Congressional purpose. Under such circumstances it is not only sensible but expected that in the absence of arbitrary or capricious conduct by the Secretary in carrying out the statutory function, his decision should be approved. Broad and liberal authority in the Secretary to carry out the Congressional purpose, coupled with the complexity of the task, makes it clear that he must have wide latitude in approving awards and grants where federal funds are to be employed. Here, however, the source of the Secretary's authority to certify grants to the Commonwealth of Pennsylvania does not arise out of a Congressional enactment mandating him to spend funds, but to the contrary, from a Court Order that prohibits him from spending funds and consequently his certification must be narrowly and strictly construed.

■ With the foregoing principles in mind, the Court shall undertake to review the certified projects and determine whether the exceptions in its January 22, 1982 Order should apply to allow exemption of the funds in question. The Court notes that as longstanding and as enduring as our system of jurisprudence itself is, so too is the principle that the Court has broad discretion in fashioning and administering a remedy for civil contempt. *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania,* 678 F.2d at 478. The conditions and exceptions within that remedy are, of course, part of the remedy and as such, in this case, the party in contempt (the Commonwealth defendants) have the burden to prove that each project for which they now seek exemption from the remedy has as its *primary* purpose the safety and the improvement of air quality.

## II.

### (1–2)

■ Federal Project Nos. PMS–GOOS (124) and PMS–OOS(128) provide for the application of inlaid cold plastic pavement markings and the application of thermoplastic or epoxy markings for legends, arrows, crosshatching and long lines at critical locations. These markings will replace paint markings on specified streets and highways. Since the *only* function of the markings is to provide needed guidance to drivers, it is clear that the only purpose of these two projects is that of safety. Moreover, these projects specifically, by their very terms, fall within the Title 23 definition of a "highway safety improvement project" as they "improve ... highway signing and pavement markings." 23 U.S.C. § 101(a). Projects PMS–GOOS(124) and PMS–OOS(128) will therefore be approved by the Court.

### (3)

■ Federal Project No. BRM–H014(1) is designed to replace the Bloomfield Bridge in Allegheny County. The bridge was closed to all traffic four years ago after it was determined at an inspection that the bridge had severely deteriorated and could no longer carry vehicular traffic safely. Under the Court's guidelines, this project does not fall within the narrow safety exception of the January 22, 1982 Order. The bridge has been closed to the public and does not pose an immediate threat to safety. The fact that motorists are now inconvenienced or that a re-built bridge would provide a quicker or more comfortable or desirable or even shorter route to their ultimate destination than the present alternative route is immaterial to the question of whether the re-building of the bridge is a project which "corrects or improves a high hazard location." The Court will therefore deny approval for this project.

### (4)

■ Federal Project No. I–376–1(38)(0) provides for various improvements to a 2.35 mile section of Interstate 376 in Allegheny County known as the Penn-Lincoln Parkway. The essential work to be performed on the proposed project is as follows: the

construction of a new concrete roadway, the reconstruction of fourteen bridge decks, a permanent correction of a rock slope, the construction of new flood walls on the westbound lanes, the replacement of the existing metal median barrier with a new concrete barrier, the replacement of the existing curbing with new curbing, and the realignment of certain on-ramps. This project is part of the general modernization plan for the 14.5 miles of I–376 now named the Parkway East.

The Commonwealth contends that the principal purpose for each improvement is that of safety. The Commonwealth cites statistical evidence which estimates that a twenty-one percent reduction in accidents would follow the completion of these improvements. There is no question that the existing highway, together with many others in the Commonwealth, are old and worn. However, the Commonwealth has failed to show that this 2.35 mile section of I–376 as it now stands constitutes an immediate hazard or threat of safety materially beyond that margin that is necessary to endure on any highway of similar vintage and condition. For example, the road surface is still usable even though it is somewhat outdated and worn. Second, each of the fourteen bridge decks, which are now proposed for reconstruction, have been determined to be in "fair" condition by the Pennsylvania Department of Transportation and have not been determined to be in imminent danger of being closed. Third, the rock slope has been temporarily stabilized and there is no immediate danger of a rock slide. Fourth, the construction of flood walls is only aimed at preventing closures of the highway during severe flooding by the Monongahela River which suggests more of a convenience and access concern than one *primarily* for safety. Fifth, the existing metal median barrier is adequate and safe when properly maintained. Finally, the Commonwealth has failed to demonstrate any immediate hazard with respect to the existing curbing or on-ramps.

Although notions of safety will surely be advanced by the construction of a new and modern roadway, the Commonwealth has failed to demonstrate that the existing roadway presents an immediate and material safety threat. The statistical evidence presented by the Commonwealth with respect to perceived reduction of accidents is only a general estimate and of questionable weight within the context of the Court's standards being applied at this time. The 2.35 mile section of I–376 for which funding is now sought has not been shown by the Commonwealth to constitute a safety hazard entitled to exemption. General highway improvements, though they may carry with them coincidentally or collaterally improved safety benefits, are not enough to carry the day for an exemption from the sanction presently in force. The Court will therefore deny approval for this project.

(5)

 Federal Project No. I–95–1(91)(14) provides for the completion of the remaining section of I–95 consisting of 0.609 miles in the vicinity of Philadelphia International Airport. The principal purpose for this project is to complete the I–95 interstate system through Pennsylvania. The Commonwealth argues that the project is for safety and air quality improvement. The Commonwealth's argument is based on the fact that motorists using I–95 must now take a 2.7 mile detour in the vicinity of the airport due to the incompletion of the interstate system. Due to the high volume of use and the very nature of the detour, it is contended that the accident rate is 230 accidents per 100 million vehicle miles. The Commonwealth argues that if I–95 were to be completed, the accident rate would drop to 151 accidents per 100 million vehicle miles. Even assuming that these statistics are valid, the Court concludes that the Commonwealth has failed to meet its burden of proving that the primary purpose for the project is one of safety. Furthermore, the Commonwealth has failed to show that the failure to complete this project now would result in an immediate hazard or danger to the public.

As noted previously, the construction of a new highway to replace an existing detour

cannot be characterized as a correction of an existing high hazard location. Improvements with respect to the *detour* which can be readily cured by the Commonwealth from its own resources may be a safety concern to the Commonwealth, but that responsibility cannot be converted into approval of this grant that has as its principal purpose the completion of interstate I–95 and not to primarily address a safety hazard.

The Commonwealth has also failed to meet its burden of proving that the principal purpose for the completion of I–95 is for air quality improvement. The Commonwealth argues that the opening of I–95 would result in a substantial reduction in carbon monoxide emissions and hydrocarbon emissions because of the abandonment of the detour. The Court, however, finds the opposite to be true. The completion of I–95 may cause the detour to be abandoned, but it is perfectly plain that it would also encourage further motor vehicle use and thus would cause an increase in motor vehicle emissions. *See Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania*, 533 F.Supp. at 833. Any decrease in auto emissions as a result of the closing of the detour would probably be cancelled by the transfer of the same as well as the likely increased traffic resulting from completion of I–95. Moreover, any improvement in air quality which would result by the completion of I–95 would be minimal when compared to the improvement in air quality that would result by the institution of an I/M program, the absence of which is at the heart of the contempt from which this exemption is being sought. In view of the above, both with respect to the safety and air quality improvement exceptions, the Court will deny approval for this project.

### (6)

■ Federal Project No. BRF–280(6) provides for the Commonwealth purchase of rights-of-way on both sides of two bridges over Park Creek and Little Neshaminy Creek, on County Line Road, in the Philadelphia area. It is fair to say that the purpose of the grant is to acquire land so that a further project to allow for the widening of the bridges at a future date may be pursued. This project is merely the first step in the construction of two wider bridges to replace existing narrow bridges. However, the existing bridges are reported by the Pennsylvania Department of Transportation to be in "fair" condition and, thus, do not present an immediate threat of safety to motorists who use those bridges. The Commonwealth has failed to demonstrate that the bridges constitute existing hazards which need immediate correction. For these reasons, the Court will deny approval of this project.

### (7)

■ Finally, Federal Project No. SRS–2000(384) provides for the correction of a slide condition which has developed into an exposed cut slope near the intersection of Stotler road and Universal Road in Allegheny County. The Commonwealth has presented no evidence of any accidents due to the slide condition or any evidence that would support a finding by the Court that the condition of the slide presents an immediate safety hazard. Rather, the concern of the Commonwealth is that damage may result to a nearby gas line or nearby private property by reason of the slide. Since the Commonwealth has failed to meet its burden of proof, the Court will deny approval for this project.

### III.

The Court has reviewed each of the seven projects certified to the Court and determined that approval should be granted for Federal Project Nos. PMS–GOOS(124) and PMS–OOS(128) and denied for Federal Project Nos. BRM–H014(1), I–376–1(38)(0), I–95–1(91)(14), BRF–280(6), and SRS–2000(384). Under the Court's sanction, approximately ninety-one million dollars has been withheld from the Commonwealth under the 1982 fiscal year until such time as the Commonwealth complies with the terms of the consent decree. It is not likely from the Court's viewpoint that it is mere coinci-

dence that the seven projects advanced by the Commonwealth and certified by the Secretary constitute the entire ninety-one million dollars presently withheld from the Commonwealth under the Court's contempt Order. Rather, it is the clearest evidence that every highway project has *some* safety feature lurking in its makeup. It would be an absurdity to try to formulate a plan or to submit a project which would have no safety element at all, or to decrease, rather than maintain or increase safety. The Court believes that while the definition and application of the concept of "safety" may allow the defendants or even the Secretary to include every dollar on hand within its coverage in respect to their duty to their respective legislatures and constituents, it is another matter indeed to expect the Court in fulfillment of its duty under the existing Order to succumb to the same temptation. For guidance in respect to the current application as well as future applications, the Court can be expected to consider exemptions favorably only when those projects have safety or air quality improvement as a material feature to their justification, as well as safety and air quality improvement as the principal purpose for which the project is deemed justified. Any inconvenience or deprivation to the citizens of the Commonwealth of Pennsylvania, other than within the exempt definition and resulting from the cut-off of the highway funds under the Court's Order, can be remedied in the manner suggested by the United States Court of Appeals for the Third Circuit in its decision affirming this Court's January 22, 1982 contempt Order when that court held:

> Any harm resulting to the citizens of Pennsylvania from a lack of federal highway funds can easily be brought to an end by actions of their elected representatives in the state legislature.

*Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania*, 678 F.2d 470, 478 (1982).