PENNSYLVANIA ET AL. *v.* DELAWARE VALLEY
CITIZENS' COUNCIL FOR CLEAN AIR ET AL.

No. 85–5.   Argued March 3, 1986—Decided July 2, 1986

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined, and in Parts I and II of which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, and in Part II of which BRENNAN, J., joined, *post*, p. 568.

*Jay C. Waldman* argued the cause for petitioners. With him on the briefs were *Henry G. Barr, Spencer A. Manthorpe, John M. Hrubovcak*, and *John P. Krill*.

*Kathryn A. Oberly* argued the cause for the United States as respondent under this Court's Rule 19.6 in support of petitioners. With her on the brief were *Solicitor General Fried, F. Henry Habicht II*, and *Deputy Solicitor General Geller*.

*James D. Crawford* argued the cause for respondents. With him on the brief was *Joyce S. Meyers*.*

JUSTICE WHITE delivered the opinion of the Court.

The questions presented in this case are first, whether the Clean Air Act, 42 U. S. C. § 7401 *et seq.*, authorizes attorney's fees awards for time spent by counsel participating in regulatory proceedings; second, whether a court may enhance an award to reflect superior quality of representation rendered by plaintiff's counsel; and third, whether enhance-

---

*A brief of *amici curiae* was filed for the State of Arizona et al. by *Francis X. Bellotti*, Attorney General of Massachusetts, and *Suzanne E. Durrell*, Assistant Attorney General, *Robert K. Corbin*, Attorney General of Arizona, *Joseph I. Lieberman*, Attorney General of Connecticut, *Michael J. Bowers*, Attorney General of Georgia, *Richard G. Opper*, Attorney General of Guam, *Corinne K. A. Watanabe*, Attorney General of Hawaii, *Jim Jones*, Attorney General of Idaho, *Neil F. Hartigan*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *David L. Armstrong*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, *Stephen H. Sachs*, Attorney General of Maryland, *Frank J. Kelley*, Attorney General of Michigan, and *Louis J. Caruso*, Solicitor General, *Edwin Lloyd Pittman*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Stephen E. Merrill*, Attorney General of New Hampshire, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Michael C. Turpen*, Attorney General of Oklahoma, *T. Travis Medlock*, Attorney General of South Carolina, *Jeffrey L. Amestoy*, Attorney General of Vermont, *William Broaddus*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, *Charles G. Brown*, Attorney General of West Virginia, and *A. G. McClintock*, Attorney General of Wyoming.

ment of the fee is proper because of plaintiff's risk of not pre-
vailing on the merits.

## I

In 1977, the Delaware Valley Citizens' Council for Clean
Air (Delaware Valley) and the United States each filed suit to
compel the Commonwealth of Pennsylvania to implement a
vehicle emission inspection and maintenance program (I/M
program) as required by the Clean Air Act. See 42 U. S. C.
§ 7410. Pursuant to a consent decree approved in 1978, the
Commonwealth agreed to establish an I/M program for 10
counties in the Philadelphia and Pittsburgh areas by August
1, 1980. The decree called for the Pennsylvania Department
of Transportation (PennDOT) to seek legislation instituting a
franchise I/M system under which the Commonwealth would
contract with garage owners for the establishment of inspec-
tion stations. If the legislature failed to approve such a sys-
tem, then the decree required PennDOT to promulgate regu-
lations allowing Pennsylvania to certify a number of private
garage facilities to perform the inspections. In addition, the
decree provided for Pennsylvania to pay Delaware Valley
$30,000 for attorney's fees and costs incurred prior to the
entry of the consent decree.

Entry of the consent decree marked only the beginning of
this story, for implementation of the I/M program did not
proceed smoothly. For simplicity's sake, we will summarize
the relevant factual developments into nine phases, with each
phase relating to a different aspect of the litigation. Not
only is this the method used by the parties and followed by
both lower courts, but it is a system for analyzing requests
for attorney's fees and costs that appears to be useful in pro-
tracted litigation.

*Phase I.* After entry of the consent decree, the Penn-
sylvania Legislature refused to enact a franchise system.
Under the decree, PennDOT then had until July 1, 1979 to
publish the necessary regulations. When PennDOT failed to
comply, Delaware Valley moved to have the Commonwealth

held in contempt; PennDOT published the proposed regulations, however, before the scheduled hearing on the motion. The court thus refrained from finding the Commonwealth in contempt, but ordered the parties to establish a revised schedule for implementation of the I/M program approved by the consent decree.

*Phase II.* After PennDOT published the proposed I/M program regulations, Delaware Valley continued to monitor the Commonwealth's performance under the consent decree, and submitted comments on the regulations which were published in the Pennsylvania Bulletin.

*Phase III.* In late 1979, the Commonwealth requested a modification of the decree delaying implementation of the I/M program until May 1981. With Delaware Valley's approval, the District Court approved the extension in March 1980.

*Phase IV.* By February 1981, the Commonwealth still had not published final regulations covering the type of equipment which private garages needed to have in order to become certified inspection stations. The Commonwealth thus asked Delaware Valley to consent to a further postponement of the implementation date to January 1, 1983. The Commonwealth argued that the United States Environmental Protection Agency had recommended a type of emission analyzer different from the one required under the consent decree, but at that time no manufacturer had produced even a prototype of such machinery.

After extensive negotiations over this extension request, the parties failed to reach an agreement. The Commonwealth then filed a motion asking the District Court to grant the second extension and delay the starting date of the I/M program until January 1, 1983. In response, Delaware Valley sought to have the court declare the Commonwealth to be in violation of the consent decree, and requested numerous modifications to the consent decree. On May 20, 1981, the court issued an order finding the Commonwealth in violation of the decree, denying the motion for a further extension, and

denying the modifications submitted by Delaware Valley. App. 25a–28a. On June 16, the court denied the Commonwealth's motion for reconsideration, but approved May 1, 1982, as the new deadline for implementation of the I/M program. *Id.*, at 44a–49a. The Commonwealth appealed both the May 20 and June 16 orders, both of which were affirmed by the Court of Appeals. *Delaware Valley Citizens' Council for Clean Air* v. *Commonwealth,* 674 F. 2d 976 (CA3), cert. denied, 459 U. S. 905 (1982).

*Phase V.* Following the District Court's order of June 16, the Pennsylvania General Assembly enacted a statute, H. B. 456, over the Governor's veto, which prohibited the expenditure of state funds by the Executive Branch for the implementation of the I/M program. Act of Oct. 5, 1981, No. 99, 1981 Pa. Laws 4. PennDOT and the remainder of the Executive Branch promptly ceased all activities related to implementing the I/M program, except for publication of the final regulations establishing specifications for the emissions analysis equipment to be used by garage owners wishing to participate as inspection locations. 11 Pa. Bull. 3519 (Oct. 10, 1981).

The Commonwealth moved to stay implementation of the consent decree in light of H. B. 456. Delaware Valley opposed that motion, and sought to have the court declare the Commonwealth in contempt and apply sanctions. The court denied the Commonwealth's motion for a stay and held the Commonwealth in civil contempt. *Delaware Valley Citizens' Council for Clean Air* v. *Commonwealth,* 533 F. Supp. 869 (ED Pa. 1982). As a sanction, the court ordered the United States Secretary of Transportation to refrain from approving any projects, or awarding any grants, for highways in the two areas covered by the consent decree, except for projects required for purposes of safety, mass transit, or air quality improvement. *Id.*, at 884–885. Once again, the Commonwealth appealed, and once again, the Court of Appeals up-

held the District Court's orders. 678 F. 2d 470 (CA3), cert. denied, 459 U. S. 969 (1982).

*Phase VI.* After the filing of the consent decree, the city of Pittsburgh and several groups of Pennsylvania legislators attempted to intervene in the litigation. Delaware Valley successfully opposed all of these attempts. *Delaware Valley Citizens' Council for Clean Air* v. *Commonwealth,* 674 F. 2d 970 (CA3), stay denied, 458 U. S. 1125 (1982).

*Phase VII.* As noted above, a portion of the District Court's contempt order prevented the United States Secretary of Transportation from authorizing the expenditure of any federal funds for federal highway projects in Pennsylvania that did not fall into certain categories. In late 1982, the United States approved seven projects for funding, certifying that they would either improve safety or improve air quality. These certifications were submitted to both Delaware Valley and the District Court. The court found that five of the projects did not qualify as exemptions under the terms of its prior order, and only approved two proposals for federal funding. *Delaware Valley Citizens' Council for Clean Air* v. *Commonwealth,* 551 F. Supp. 827 (ED Pa. 1982).

*Phase VIII.* On May 3, 1983, the Pennsylvania General Assembly finally passed legislation authorizing the Commonwealth to proceed with implementation of the I/M program, and the Governor signed the bill into law the next day. 75 Pa. Cons. Stat. §§ 4706–4707 (1984). Subsequently, Delaware Valley and the Commonwealth negotiated a new compliance schedule, under which the I/M program would begin by June 1, 1984. The District Court approved of this new schedule, and vacated its earlier contempt sanctions.

*Phase IX.* This phase includes work done by Delaware Valley in hearings before the Environmental Protection Agency, during which, *inter alia,* the Commonwealth unsuc-

cessfully sought that agency's approval of an I/M program covering a smaller geographic area.[1]

Delaware Valley then sought attorney's fees and costs for the work performed after issuance of the consent decree in 1978. App. 50a–86a. The District Court awarded Delaware Valley $209,813 in attorney's fees and an additional $6,675.03 in costs. 581 F. Supp. 1412, 1433 (ED Pa. 1984). To calculate the legal fee award, the District Court first determined:

> "[T]he number of hours reasonably necessary to perform the legal services for which compensation is sought. The reasonable number of hours is then multiplied by a reasonable hourly rate for the attorney providing the services, the latter being based on the court's determination of the attorney's reputation, status and type of activity for which the attorney is seeking compensation. The sum of the two figures is the 'lodestar' which can then be adjusted upward or downward based on the contingency of success, and the quality of an attorney's work. In all instances plaintiffs have the burden of establishing entitlement to the award claimed and any

---

[1] This phase also includes work done by Delaware Valley in related state-court litigation. *Burd* v. *Pennsylvania Dept. of Transportation*, 66 Pa. Commw. 129, 443 A. 2d 1197 (1982), rev'd on other grounds *sub nom. Scanlon* v. *Pennsylvania Dept. of Transportation*, 502 Pa. 577, 467 A. 2d 1108 (1983), was brought by a group of state legislators to challenge the Executive Branch's authority to implement an I/M program. On appeal, Delaware Valley submitted an *amicus* brief supporting the Commonwealth. The Pennsylvania Supreme Court determined that state officials had no authority to enter into the federal consent decree in 1978, held the decree to be a "nullity," *id.*, at 590, 467 A. 2d, at 1115, and remanded the case to the Commonwealth Court, which later enjoined PennDOT from following the terms of the decree. The Commonwealth then moved to vacate the consent decree pursuant to Federal Rule of Civil Procedure 60(b). The District Court denied the motion, and the Court of Appeals affirmed. *Delaware Valley Citizens' Council for Clean Air* v. *Commonwealth*, 755 F. 2d 38 (CA3), cert. denied, 474 U. S. 819 (1985).

adjustment to the 'lodestar.'" *Id.*, at 1419 [citations omitted].

The court used three separate hourly rates in making its award. Work which the court found to be "most difficult" was compensated at an hourly rate of $100. For work that could have been done "by an attorney working at the associate level," the hourly rate was set·at $65. And for work "which required little or no legal ability," the court allowed an hourly rate of $25. *Id.*, at 1422.

For the most part, the hours for which Delaware Valley sought compensation were those spent on the postdecree litigation itself.[2] In Phases II and IX, however, Pennsylvania objected that Delaware Valley was seeking compensation for work done in only tangentially related state and federal administrative proceedings. The District Court rejected this argument, and found that because the proposed regulations would have affected Delaware Valley's rights under the consent decree, it had a unique interest in the proceedings that made its work sufficiently related to the litigation to be compensable. See *id.*, at 1423, 1429–1430.

After determining the "lodestar" amounts for all phases of the litigation, the court next considered Delaware Valley's request for "multipliers" to adjust these figures for "the con-

---

[2] In determining the lodestar amounts, the District Court eliminated more than one-third of all of the hours submitted by Delaware Valley. Some of these hours were eliminated because they were not documented in sufficient detail. 581 F. Supp., at 1420–1421. Additional hours were excluded because the court disallowed all time spent by attorneys in preparing for or in attending hearings in which another attorney for Delaware Valley was the principal advocate. *Id.*, at 1421. The court also denied a certain number of hours for activities in related proceedings that it found were not necessary to protect Delaware Valley's rights under the consent decree. *Id.*, at 1430. Finally, a significant number of hours were eliminated based on the court's conclusion that the time spent on the particular activity was "excessive," or that a less amount of time was "reasonable." See *e. g.*, *id.*, at 1423, 1425, 1429.

tingent nature of the case, the quality of the work performed and the results obtained." *Id.*, at 1431, citing *Hensley* v. *Eckerhart*, 461 U. S. 424, 434–435 (1983). Given that the case involved new legal theories with little precedent, and that Delaware Valley was forced to go up against both the Federal Government and the Commonwealth of Pennsylvania to obtain the consent decree initially and then to protect it from being overturned, the court found "[t]he contingent nature of [Delaware Valley's] success [to have] been apparent throughout this litigation." 581 Supp., at 1431. The court also found that Delaware Valley's work during Phase V was "superior," and that an "[a]n increase based on the quality of work which culminated in an outstanding result is fully justified." *Ibid.* (citation omitted).

Accordingly, the District Court applied a multiplier of two to the awards in Phases IV, V, and VII to reflect the low likelihood of success Delaware Valley faced in those stages of the litigation. In addition, the court added a separate multiplier of two to Phase V to adjust the lodestar for the high quality of representation provided in that phase. The court's final calculation of the fee award for each of the nine phases was as follows:[3]

| | Lodestar | Multiplier | Total |
|---|---|---|---|
| Phase I | $ 4,478.50 | — | $ 4,478.50 |
| Phase II | 1,722.50 | — | 1,722.50 |
| Phase III | 1,745.00 | — | 1,745.00 |
| Phase IV | 36,711.50 | 2 | 73,423.00 |
| Phase V | 27,372.50 | 4 | 109,490.00 |
| Phase VI | 1,820.00 | — | 1,820.00 |
| Phase VII | 5,370.50 | 2 | 10,741.00 |
| Phase VIII | 1,560.00 | — | 1,560.00 |
| Phase IX | 1,453.00 | — | 1,453.00 |

---

[3] The District Court also awarded Delaware Valley an additional $3,380 in legal fees for the work done preparing the fee petition itself. 581 F. Supp., at 1431.

The Court of Appeals for the Third Circuit affirmed. 762 F. 2d 272 (1985). The court analogized § 304(d) of the Clean Air Act, which provides for counsels' fees, to other statutory attorney's fee provisions, and held that "the jurisprudence regarding the calculation of reasonable attorneys fees developed in connection with other attorneys fees statutes—particularly [42 U. S. C.] § 1988—is applicable to cases brought pursuant to § 304(d)." 762 F. 2d, at 275.

The court affirmed the award of fees for time spent commenting on the Commonwealth's proposed regulations in Phase II for the reasons stated by the District Court. *Id.*, at 276–277. The Court of Appeals also agreed that the fee award for the time devoted by Delaware Valley in Phase IX was proper "because adoption of the state plan modification would have impaired the rights won by [Delaware Valley] in the consent decree." *Id.*, at 277. The court took note of *Webb* v. *Board of Ed. of Dyer County*, 471 U. S. 234 (1985), in which this Court held that time spent on "optional administrative proceedings" may be compensable under § 1988 if the work was "both useful and of a type ordinarily necessary to advance the . . . litigation" to the point where the party succeeded. *Id.*, at 243. The Court of Appeals found that the work of counsel in Phases II and IX "was useful and necessary for securing full enforcement of the decree," and that the District Court's fee awards for these two phases were consistent with *Webb*. 762 F. 2d., at 277, n. 7.

With respect to the use of multipliers, the Court of Appeals concluded that "this was 'the rare case where the fee applicant offer[ed] specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."'" *Id.*, at 280, quoting *Blum* v. *Stenson*, 465 U. S. 886, 899 (1984). The court also approved the use of "contingency" multipliers to compensate Delaware Valley for the risk of not prevailing. The court stated:

"Unlike *Blum*, [Delaware Valley] specifically identified the risks inherent in this litigation in its brief to the district court and, although the Supreme Court considers it an open question whether contingency of success can properly justify a lodestar increase, we have resolved the question in this court. *See Hall* v. *Borough of Roselle*, 747 F. 2d 838 (3d Cir.1984); *Lindy [Brothers Builders, Inc.* v. *American Radiator & Standard Sanitary Corp.]*, 540 F. 2d [102,] 117 [(CA3 1976) (en banc)]." 762 F. 2d, at 282.

The court also rejected the Commonwealth's arguments that the District Court failed to make specific findings of fact in awarding the multipliers, and that the court abused its discretion in determining the size of the multipliers. *Ibid.*[4] We granted certiorari, 474 U. S. 815 (1985), and now affirm in part and reverse in part.

## II

Section 304(d) of the Clean Air Act, 84 Stat. 1706, 42 U. S. C. § 7604(d), provides, in pertinent part, as follows:

"The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."

The Commonwealth argues that the plain language of the statute clearly limits the award of fees to "costs of litigation"

[4] Judge Becker dissented from the court's affirmance of the award of multipliers. The risk of not prevailing in Phases IV and VII was "simply insufficient to justify the very substantial multiplier awarded by the district court," because in both phases, the Commonwealth had the burden of proof in seeking to modify the consent decree. 762 F. 2d, at 282, n. 12. As for the multiplier of four used in Phase V, Judge Becker concluded that, "even assuming an award of quality and contingency multipliers is appropriate . . . , the multipliers must be recalculated because the case was not so very rare as to justify in light of *Blum* the award of this extraordinary multiplier." *Ibid.* (citations omitted).

for "action[s] brought" under the Act, and that the lower courts erred in awarding attorney's fees for Delaware Valley's activities in Phases II and IX, both of which involved the submission of comments on draft regulations to administrative agencies. The United States echoes these assertions, and contends that the "actions" contemplated by § 304(d) are judicial actions, not administrative proceedings. We reject these limiting constructions on the scope of § 304(d).

Although it is true that the proceedings involved in Phases II and IX were not "judicial" in the sense that they did not occur in a courtroom or involve "traditional" legal work such as examination of witnesses or selection of jurors for trial, the work done by counsel in these two phases was as necessary to the attainment of adequate relief for their client as was all of their earlier work in the courtroom which secured Delaware Valley's initial success in obtaining the consent decree. This case did not involve a single tortious act by the Commonwealth that resulted in a discrete injury to Delaware Valley, nor was the harm alleged the kind that could be remedied by a mere award of damages or the entry of declaratory relief. Instead, Delaware Valley filed suit to force the Commonwealth to comply with its obligations under the Clean Air Act to develop and implement an emissions inspection and maintenance program covering 10 counties surrounding two major metropolitan areas. To this end, the consent decree provided detailed instructions as to how the program was to be developed and the specific dates by which these tasks were to be accomplished.

Protection of the full scope of relief afforded by the consent decree was thus crucial to safeguard the interests asserted by Delaware Valley; and enforcement of the decree, whether in the courtroom before a judge, or in front of a regulatory agency with power to modify the substance of the program ordered by the court, involved the type of work which is properly compensable as a cost of litigation under § 304. In a

case of this kind, measures necessary to enforce the remedy ordered by the District Court cannot be divorced from the matters upon which Delaware Valley prevailed in securing the consent decree.

Several courts have held that, in the context of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988, postjudgment monitoring of a consent decree is a compensable activity for which counsel is entitled to a reasonable fee. See, *e. g.*, *Garrity* v. *Sununu*, 752 F. 2d 727, 738–739 (CA1 1984); *Bond* v. *Stanton*, 630 F. 2d 1231, 1233 (CA7 1980); *Miller* v. *Carson*, 628 F. 2d 346, 348 (CA5 1980); *Northcross* v. *Board of Ed. of Memphis City Schools*, 611 F. 2d 624, 637 (CA6 1979), cert. denied, 447 U. S. 911 (1980). Although § 1988 authorizes fees in "any action or proceeding" brought to enforce the Civil Rights Acts, and § 304(d) applies only to "any action" brought under the Clean Air Act, this distinction is not a sufficient indication that Congress intended § 304(d) to apply only to judicial, and not administrative, proceedings.

First, in several instances in the legislative history of this section, Congress used the words "action" and "proceeding" interchangeably. See, *e. g.*, S. Rep. No. 91–1196, p. 37 (1970); 1 Legislative History of the Clean Air Amendments of 1970 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–18, p. 136 (1974) (Senate Consideration of the Report of the Conference Committee, Dec. 18, 1970) (Leg. Hist.). The lack of the phrase "or proceedings" on the face of § 304(d) is not necessarily indicative of the intended scope of the section.

Second, and more importantly, the purposes behind both § 304(d) and § 1988 are nearly identical, which lends credence to the idea that they should be interpreted in a similar manner. *Northcross* v. *Memphis Board of Ed.*, 412 U. S. 427, 428 (1973). Section 1988 was enacted to insure that private citizens have a meaningful opportunity to vindicate their rights protected by the Civil Rights Acts. *Hensley* v.

*Eckerhart*, 461 U. S., at 429.  See S. Rep. No. 94–1011, p. 2 (1976).  "The effective enforcement of Federal civil rights statutes depends largely on the efforts of private citizens," and unless reasonable attorney's fees could be awarded for bringing these actions, Congress found that many legitimate claims would not be redressed.  H. R. Rep. No. 94–1558, p. 1 (1976).

Similarly, § 304(a) authorizes private citizens to sue any person violating the Clean Air Act, and § 304(d) provides for reasonable attorney's fees whenever appropriate.  Congress enacted § 304 specifically to encourage "citizen participation in the enforcement of standards and regulations established under this Act," S. Rep. No. 91–1196, p. 36 (1970), and intended the section "to afford . . . citizens . . . very broad opportunities to participate in the effort to prevent and abate air pollution."  1 Leg. Hist., p. 138 (Senate Consideration of the Report of the Conference Committee, Dec. 18, 1970) (remarks of Sen. Eagleton).  Congress found that "Government initiative in seeking enforcement under the Clean Air Act has been restrained," S. Rep. No. 91–1196, at 36, and urged the courts to "recognize that in bringing legitimate actions under this section citizens would be performing a public service and in such instances the courts should award costs of litigation to such party."  *Id.*, at 38.

Given the common purpose of both § 304(d) and § 1988 to promote citizen enforcement of important federal policies, we find no reason not to interpret both provisions governing attorney's fees in the same manner.  We hold, therefore, that the fact that the work done by counsel in Phases II and IX did not occur in the context of traditional judicial litigation does not preclude an award of reasonable attorney's fees under § 304(d) for the work done during these portions of the present action.[5]

---

[5] We express no judgment on the question whether an award of attorney's fees is appropriate in federal administrative proceedings when there is no connected court action in which fees are recoverable.

This conclusion is consistent with our opinion in *Webb* v. *Board of Ed. of Dyer County*, 471 U. S. 234 (1985). There, we noted that for the time spent pursuing optional administrative proceedings properly to be included in the calculation of a reasonable attorney's fee, the work must be "useful and of a type ordinarily necessary" to secure the final result obtained from the litigation. *Id.*, at 243. Application of this standard is left to the discretion of the district court. *Id.*, at 243–244.

Here, the District Court found that, as for Phase II, Delaware Valley had a unique interest in the proposed regulation "based on a desire to ensure compliance with the consent decree and to protect [its] rights thereunder. The usefulness of [Delaware Valley's] comments was manifested in the revisions that were made to the original regulations." 581 F. Supp., at 1423. Similarly, the court found that counsel's work during Phase IX helped to protect the relief awarded under the consent decree, as any modification of the I/M program by the Environmental Protection Agency would have adversely affected Delaware Valley's rights under the decree. *Id.*, at 1430. We agree that participation in these administrative proceedings was crucial to the vindication of Delaware Valley's rights under the consent decree and find that compensation for these activities was entirely proper and well within the "zone of discretion" afforded the District Court. *Hensley, supra*, at 442 (BRENNAN, J., concurring in part and dissenting in part). We thus affirm the award of fees for work done in Phases II and IX.

## III

### A

It is well established that, under the "American Rule," "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 247 (1975). There are exceptions to this principle, the major one being

congressional authorization for the courts to require one party to award attorney's fees to the other.[6]  There are over 100 separate statutes providing for the award of attorney's fees; and although these provisions cover a wide variety of contexts and causes of action, the benchmark for the awards under nearly all of these statutes is that the attorney's fee must be "reasonable."

Courts have struggled to formulate the proper measure for determining the "reasonableness" of a particular fee award. One method, first employed by the Fifth Circuit in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F. 2d 714 (1974), involved consideration of 12 factors.[7]  *Johnson* was widely followed by other courts, and was cited with approval by both the House and the Senate when § 1988 was enacted into law. H. R. Rep. No. 94–1558, p. 8 (1976); S. Rep. No. 94–1011, p. 6 (1976).

This approach required trial courts to consider the elements that go into determining the propriety of legal fees and

[6] In addition to this statutory exception, courts traditionally have recognized three other other exceptions to the "American Rule."  First, courts can enforce their own orders by assessing attorney's fees for the wilfull violation of a court order.  *Alyeska*, 421 U. S., at 258.  Second, courts are empowered to award fees against a losing party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  *Id.*, at 258–259.  And finally, a court's equitable powers allow it to award fees in commercial litigation to plaintiffs who recovered a "common fund" for themselves and others through securities or antitrust litigation.  *Id.*, at 257.  None of these situations are involved in the present case.

[7] The 12 factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  488 F. 2d, at 717–719.  These factors were taken from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106 (1980).

was intended to provide appellate courts with more substantial and objective records on which to review trial court determinations. See *Johnson, supra,* at 717. This mode of analysis, however, was not without its shortcomings. Its major fault was that it gave very little actual guidance to district courts. Setting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results.

For this reason, the Third Circuit developed another method of calculating "reasonable" attorney's fees. This method, known as the "lodestar" approach, involved two steps. First, the court was to calculate the "lodestar," determined by multiplying the hours spent on a case by a reasonable hourly rate of compensation for each attorney involved. *Lindy Bros. Builders, Inc. of Philadelphia* v. *American Radiator & Standard Sanitary Corp.*, 487 F. 2d 161, 167 (CA3 1973) *(Lindy I).* Second, using the lodestar figure as a starting point, the court could then make adjustments to this figure, in light of "(1) the contingent nature of the case, reflecting the likelihood that hours were invested and expenses incurred without assurance of compensation; and (2) the quality of the work performed as evidenced by the work observed, the complexity of the issues and the recovery obtained." *Merola* v. *Atlantic Richfield Co.*, 515 F. 2d 165, 168 (CA3 1975); *Lindy Bros. Builders, Inc. of Philadelphia* v. *American Radiator & Standard Sanitary Corp.*, 540 F. 2d 102, 117 (CA3 1976) *(Lindy II).* This formulation emphasized the amount of time expended by the attorneys, and provided a more analytical framework for lower courts to follow than the unguided "factors" approach provided by *Johnson.* On the other hand, allowing the courts to adjust the lodestar amount based on considerations of the "riskiness" of the lawsuit and the quality of the attorney's work could still produce inconsistent and arbitrary fee awards.

We first addressed the question of the proper manner in which to determine a "reasonable" attorney's fee in *Hensley*

v. *Eckerhart*, 461 U. S. 424 (1983). We there adopted a hybrid approach that shared elements of both *Johnson* and the lodestar method of calculation. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." 461 U. S., at 433. To this extent, the method endorsed in *Hensley* follows the Third Circuit's description of the first step of the lodestar approach. Moreover, we went on to state: "The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward. . . ." *Id.*, at 434. We then took a more expansive view of what those "other considerations" might be, however, noting that "[t]he district court also may consider [the] factors identified in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F. 2d 714, 717–719 (CA5 1974), though it should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.*, at 434, n. 9 (citation omitted).

We further refined our views in *Blum* v. *Stenson*, 465 U. S. 886 (1984). *Blum* restated that the proper first step in determining a reasonable attorney's fee is to multiply "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Id.*, at 888. We emphasized, however, that the figure resulting from this calculation is more than a mere "rough guess" or initial approximation of the final award to made. Instead, we found that "[w]hen . . . the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product *is presumed* to be the reasonable fee" to which counsel is entitled. *Id.*, at 897 (emphasis added).

*Blum* also limited the factors which a district court may consider in determining whether to make adjustments to

the lodestar amount. Expanding on our earlier finding in *Hensley* that many of the *Johnson* factors "are subsumed within the initial calculation" of the lodestar, we specifically held in *Blum* that the "novelty [and] complexity of the issues," "the special skill and experience of counsel," the "quality of representation," and the "results obtained" from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award. 465 U. S., at 898–900. Although upward adjustments of the lodestar figure are still permissible, *id.*, at 901, such modifications are proper only in certain "rare" and "exceptional" cases, supported by both "specific evidence" on the record and detailed findings by the lower courts. See *id.*, at 898–901.

A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a "reasonable" fee is wholly consistent with the rationale behind the usual fee-shifting statute, including the one in the present case. These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws. Hence, if plaintiffs, such as Delaware Valley, find it possible to engage a lawyer based on the statutory assurance that he will be paid a "reasonable fee," the purpose behind the fee-shifting statute has been satisfied.

Moreover, when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly

rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

## B

With this teaching from our prior cases in mind, we sustain the Commonwealth's contention that the lower courts erred in increasing the fee award to Delaware Valley in Phase V based on the "superior quality" of counsel's performance. Relying on the statement in *Blum* that an upward adjustment may be justified in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional," the Third Circuit affirmed both the District Court's findings concerning the "superior quality" of Delaware Valley's counsel's work in Phase V, and the "outstanding result" obtained in this phase and its holding that an increase in this portion of the lodestar by a factor of two was appropriate. 762 F. 2d, at 280–282.

We cannot agree. Because considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate, the overall quality of performance ordinarily should not be used to adjust the lodestar, thus removing any danger of "double counting."

Furthermore, we are unpersuaded that the lodestar amount determined for Phase V in this case did not fully reflect the quality and competence of the legal services rendered by Delaware Valley's lawyers. For this portion of the litigation, counsel sought compensation for approximately 620 hours of work. 581 F. Supp., at 1427. Of these, the District Court allowed compensation for 324 hours. The Dis-

trict Court's elimination of a large number of hours on the grounds that they were unnecessary, unreasonable, or unproductive is not supportive of the court's later conclusion that the remaining hours represented work of "superior quality."

We also note that of the 324 hours compensated, 26 hours were compensated at $25 per hour, 88 hours were billed at an hourly rate of $65, and the remaining 210 hours were paid at $100 per hour. *Id.*, at 1427–1428. By the court's own definition, the $25 rate was applied to work "which required little or no legal ability," and the $65 rate was proper for work "that could have been done by an attorney working at the associate level." *Id.*, at 1422. Given that nearly one-third of all of the hours reasonably spent on this phase were not compensated at the hourly rate for work which the court found to be "most difficult," it is hard to see what made the quality of representation for those hours so "superior" that it was not reflected in the hourly rate used to determine the lodestar amount. This conclusion is reinforced by the fact that the Third Circuit expressly found that the $100 hourly rate for the attorney compensated for the 210 hours was "plainly appropriate" given that he was an "inexperienced attorne[y]" without "any prior significant litigation experience." 762 F. 2d, at 279, n. 10. See also 581 F. Supp., at 1422 (District Court set fees based on evaluation of "the status, reputation and experience of the individual attorneys who performed the activity").

In sum, viewing the evidence submitted by Delaware Valley to support its petition for attorney's fees, there is no indication as to why the lodestar did not provide a reasonable fee award reflecting the quality of representation provided during Phase V of the litigation. Clearly, Delaware Valley was able to obtain counsel without any promise of reward for extraordinary performance. Furthermore, Delaware Valley presented no specific evidence as to what made the results it obtained during this phase so "outstanding," nor did it pro-

vide any indication that the lodestar figure for this portion of the case was far below awards made in similar cases where the court found equally superior quality of performance. Finally, neither the District Court nor the Court of Appeals made detailed findings as to why the lodestar amount was unreasonable, and in particular, as to why the quality of representation was not reflected in the product of the reasonable number of hours times the reasonable hourly rate. In the absence of such evidence and such findings, we find no reason to increase the fee award in Phase V for the quality of representation.

## IV

There remains the question of upward adjustment, by way of multipliers or enhancement of the lodestar, based on the likelihood of success, or to put it another way, the risk of loss. This is the question that we left open in *Blum* and on which the Courts of Appeals are not entirely in accord. We are of the view that our resolution of the issue would be benefited by reargument and hence we do not decide it now. Accordingly, an order will issue restoring the case to the argument docket insofar as it raises the question whether attorney's fees chargeable to a losing defendant under the Clean Air Act and the comparable statutes may be enhanced based on the risk of loss, and if so, to what extent.

The judgment below is therefore affirmed insofar as it upheld the award of attorney's fees for the work done in Phases II and IX and, except for the multiplier for risk, is otherwise reversed.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, and with whom JUSTICE BRENNAN joins as to Part II, concurring in part and dissenting in part.

## I

I dissent from the piecemeal adjudication of the issues in this case. I would set the entire case, and not just a part of

it, for reargument next Term. This rush to judgment on certain issues will serve only to confuse the federal courts until the entire case is decided. But the Court insists on covering the merits in part, and so I turn to them.

## II

I join only Parts I and II of the Court's opinion. In Part III, the Court purports to follow *Blum* v. *Stenson*, 465 U. S. 886 (1984), in which we held that an adjustment for quality was available "in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" *Id.*, at 899, citing *Hensley* v. *Eckerhart*, 461 U. S. 424, 435 (1983). The Court today, however, improperly heightens the showing required to the point where it may be virtually impossible for a plaintiff to meet. Compare *Blum, supra*, at 899, with *ante*, at 567–568.

Although the District Court's decision was issued before *Blum*, its quality adjustment in Phase V was in full accord with the standards subsequently laid down in *Blum*. Compare 581 F. Supp. 1412, 1431 (ED Pa. 1984), with 465 U. S., at 899. The proper standard of review of an attorney's fee award is abuse of discretion. *Evans* v. *Jeff D.*, 475 U. S. 717, 742–743 (1986); *Blum, supra*, at 896. I do not think the District Court abused its discretion in multiplying by two the lodestar for Phase V in order to adjust for quality. If the majority applied the proper, deferential standard of review on the quality issue rather than substituting its judgment for that of the District Court, see *ante*, at 566–567, it may have reached the same result as I do.