NINTENDO OF AMERICA,
INC., Plaintiff,

v.

NTDEC; Nintendo Electronic Co.; Jimmy
Yao; Wang Wen–Fu; Wang Su–Tang;
Chen Mei–Lin; and Mega Soft Inc., De-
fendants.

No. CV 91–300–TUC–JFB (WDB).

United States District Court,
D. Arizona.

May 19, 1993.

Sandra S. Froman, Howard R. Wine, Snell
& Wilmer, Tucson, AZ, and F. Ross Boundy,
Diana V. Blaknew, Christensen, O'Connor,
Johnson & Kindness, Seattle, WA, for plain-
tiff.

None appearing for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BATTIN, Senior District Judge, Visiting.

An evidentiary hearing regarding damages
in the above-captioned matter was held on
March 30, 1993, before Senior United States
District Judge James F. Battin. Notice was
given to the defaulted Defendants but they
failed to appear to rebut the testimony pre-
sented by Plaintiff Nintendo of America, Inc.
(hereinafter "Nintendo"). The Court, having
heard the testimony of the witnesses[1] and
having reviewed the exhibits admitted into
evidence, makes the following Findings of
Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Nintendo is a Washington corporation
with corporate headquarters in Redmond,
Washington. Nintendo is a wholly-owned
subsidiary of Nintendo Company, Ltd.
("NCL") of Kyoto, Japan, and owns the copy-
rights and trademarks in its products in the

---

1. The Court heard the oral testimony of Ms. Lynn
E. Hvalsoe, John Tintinger, James Perrone, Mike
Woodworth, and Robert Chesney.

United States as well as in many other countries, such as Canada, Mexico, and South America. Nintendo markets its products in countries under registered Nintendo trademarks.

2. Nintendo is a leader in the video game industry with a reputation both in the United States and abroad for developing and producing high quality video game products.

3. Nintendo owns numerous, valid United States copyright registrations and trademarks registrations, including but not limited to the following:

### U.S. COPYRIGHT REGISTRATIONS

| GAME TITLE | COPYRIGHT REGISTRATION NO. | GAME TITLE | COPYRIGHT REGISTRATION NO. |
|---|---|---|---|
| Balloon Fight | PA 247–651 | Mach Rider | PA 284–966 |
| Baseball | PA 219–072 | Mario Bros. | PA 178–079 |
| Clu Clu Land | PA 246–926 | Pinball | PA 247–092 |
| Donkey Kong | PA 115–040 | Popeye | PA 154–248 |
| Donkey Kong 3 | PA 191–724 | Slalom | PA 908–801 |
| Donkey Kong Jr. | PA 146–003 | Soccer | PA 288–502 |
| Donkey Kong Jr. Math | PA 289–101 | Super Mario Bros. | PA 273–028 |
| Duck Hunt | PA 254–151 | Super Mario Bros. 2 | PA 451–717(FCS) |
| Excitebike | PA 254–906 | Super Mario Bros. 3 | PA 454–718(FCS) |
| | | | PA 454–812(NES) |
| F–1 Race | PA 540–572 | Tennis | PA 204–665 |
| Golf | PA 246–462 | Urban Champion | PA 241–478 |
| Hogan's Alley | PA 260–315 | Volleyball | PA 339–801 |
| Ice Climber | PA 254–907 | Wrecking Crew | PA 287–352 |

### U.S. TRADEMARK REGISTRATIONS

| TRADEMARK | TRADEMARK REGISTRATION NO. | GAME TITLE | TRADEMARK REGISTRATION NO. |
|---|---|---|---|
| BALLOON FIGHT | 1,454,474 | NINTENDO | 1,213,822 |
| DONKEY KONG | 1,331,984 | NINTENDO ENTERTAINMENT SYSTEM | 1,440,706 |
| DONKEY KONG 3 | 1,328,723 | NINTENDO OFFICIAL SEAL OF QUALITY AND DESIGN | 1,570,911 |
| DONKEY KONG JR. | 1,328,713 | SLALOM | 1,447,728 |
| F–1 RACE | 1,667,216 | URBAN CHAMPION | 1,469,207 |
| HOGAN'S ALLEY | 1,376,107 | DUCK HUNT | 1,377,451 |
| ICE CLIMBER | 1,467,524 | EXCITEBIKE | 1,379,330 |
| MACH RIDER | 1,486,969 | SUPER MARIO BROS. | 1,453,314 |
| MARIO BROS. | 1,303,633 | WRECKING CREW | 1,398,680 |

4. The above-identified Nintendo copyright registrations protect the audiovisual aspects of the applicable Nintendo video games.

5. The above-identified Nintendo trademark registrations protect various trademarks used by Nintendo in conjunction with its video game products. Nintendo's video game products are sold under its trademarks, which are recognized by the trade and purchasing public as being associated with only the highest quality products.

6. The commercial life span of a video game is limited, and the development and promotion of such games is costly. For instance, a single game may take a team of several authors up to two years to designate and develop and can cost as much as $500,-000.00 or more to develop.

7. Nintendo has widely advertised and promoted its video game products throughout the United States and internationally. The extensive advertising and promotional campaigns have resulted in widespread use

**1464**

and acknowledgement of Nintendo products to the extent that approximately 90% of the homes in the United States are familiar with Nintendo's products. As a result, Nintendo has established a tremendous amount of goodwill in its trademarks domestically as well as internationally.

8. The sale, advertising and distribution of counterfeit video game cartridges results in lost profits to Nintendo and causes damage to Nintendo's business reputation.

9. During the combined years of 1990 and 1991, Nintendo and its licensees lost at least $2 billion worth of wholesale sales in the United States due to counterfeiting activity, and an additional $2 billion internationally. Approximately 30% of those losses were directly attributable to Nintendo.

10. In 1990, approximately 20–50 million counterfeit video games were sold in the Western Hemisphere. Of these, approximately 75% violate one or more of Nintendo's registered trademarks.

11. Nintendo has an enforcement program for combating such infringement including reliance on the U.S. Customs Service to seize imported infringing products prior to entry into this country.

12. Through random inspection of goods, the U.S. Customs Service is able to prevent approximately 2–5% of such counterfeit importations into the United States.

13. Defendants NTDEC and NINTENDO ELECTRONIC COMPANY (jointly "NTDEC") are Taiwanese corporations, or are one and the same Taiwanese corporation.

14. Defendants JIMMY YAO, WANG WEN–FU, WANG SU–TANG, and CHEN MEI–LIN are citizens of Taiwan.

15. MEGASOFT, INC. of Los Angeles, California, is or was intended to be a United States corporation owned and operated by the previously identified Defendants to this action.

16. Nintendo has neither licensed nor assigned any copyright or trademark right to any of the Defendants. None of the Defendants has ever had any authority to act for Nintendo, whether as a licensee, distributor, agent or in any other capacity.

17. Nintendo was alerted to Defendants' activities as a result of an on-going investigation of counterfeiting activities in Taiwan and elsewhere. On October 8, 1990, during the course of an undercover investigation of Defendants' activities, Nintendo's investigators visited and observed the Defendants' offices in Taiwan. The investigators were given a tour of the facilities and observed activities consistent with the operation of counterfeit video game production.

18. In the course of the investigation, Defendants provided the investigators with sale brochures (which contained advertisements for counterfeit Nintendo video game cartridges) and sold the investigators counterfeit video game cartridges. These games, sold and advertised by Defendants, were direct copies of Nintendo's copyrighted video games bearing one or more of Nintendo's registered trademarks.

19. Defendants admitted to Nintendo's investigators orally and in writing that they knew their actions, with regard to the advertisement and sale of counterfeit Nintendo video game cartridges, were illegal in the United States.

20. Defendants also provided the undercover investigators with price lists, showing sale prices of counterfeit Nintendo video game cartridges ranging from $1.93 for a single game cartridge to $34.00 for an 82–in–1 video game cartridge.

21. At different times in the course of the investigation, Defendants communicated orally and/or in writing that their factory could produce 1.2 million video game cartridges per year.

22. Defendants were active in their sales of counterfeit Nintendo video game cartridges from at least January of 1990 to June of 1991. On June 4, 1991, Defendants Jimmy Yao and Wang Wen–Fu (aka Uen Fu Wang) were arrested in Chicago for violating 18 U.S.C. § 2320 (trafficking in counterfeit goods) on the basis of their importation and sale of counterfeit Nintendo video game cartridges in the United States. The U.S. Attorneys' office did not prosecute the charges against the individual Defendants in exchange for the Defendant Nintendo Electronic Company, Ltd.'s December 23, 1991, guilty plea to the same felony charge. As a result,

Defendant Nintendo Electronic Company, Ltd. paid a $50,000.00 fine and restitution in the amount of $2,442.50.

23. Documents seized from Defendants Wang and Yao at the time of their arrest included documents which reflected widespread activity in the assembly and distribution of counterfeit Nintendo video game cartridges.

24. In addition to the information obtained in the investigation of the Defendants, evidence procured through U.S. Customs' and/or FBI's seizures in New York, Ohio, Arizona, Florida, Nevada, Texas, and Montana of counterfeit video game products revealed that Defendants, acting wholly without authority, infringed Nintendo's valuable intellectual property rights in the advertisement, distribution and sales of counterfeit video games to customers in many other locations.

25. The evidence further showed:

a). Defendants sold at least 135 counterfeit Nintendo video game cartridges to a Taiwanese company known as Dar Yar which in turn sold those counterfeit cartridges to an undercover purchaser in North Carolina.

b). Defendants provided catalogs advertising counterfeit Nintendo video game cartridges and provided counterfeit Nintendo video game cartridges themselves to a customer in Miami, Florida, known as Galaxia, which in turn sold at least $20,000.00 in cartridges to purchasers in Peru, at least $10,000.00 in cartridges to purchasers in Venezuela, and at least $2,000.00 in cartridges to purchasers in Costa Rica. Defendants also supplied counterfeit Nintendo cartridge components to Galaxia's factory in Venezuela which sold 150,000 counterfeit Nintendo cartridges per month, 20,000 cartridges per month of which were shipped to Mexico. Galaxia sold counterfeit Nintendo cartridges for approximately two years.

c). For an unknown period of time, Defendants sold 5,000–6,000 counterfeit Nintendo video game cartridges every three weeks to a company located in Mexico known as Mercadeo. Defendants conducted at least $2 million dollars worth of business with Mercadeo in the eighteen month period preceding August 8, 1990.

d). Defendants sold counterfeit Nintendo video game cartridges to Eviatar Parnass in Jacksonville, Florida during at least the year 1990. Products which were included in these sales were later discovered and seized in a civil action for trademark and copyright infringement brought by Nintendo against Mr. Parnass. The action resulted in a civil judgment against Mr. Parnass in the United States District Court, Middle District of Florida, Jacksonville Division, in the amount of $1,194,000.00 plus attorneys fees and costs. This judgment was entered September 9, 1992 and has never been satisfied.

e). Defendants sold counterfeit Nintendo video cartridges to a company known as Rapidex in Miami, Florida, including a 250–in–1 Nintendo video game cartridge being sold by Rapidex for $330.00, and a 190–in–1 Nintendo video game cartridge which Rapidex sold for $150.00.

f). Defendants also supplied counterfeit Nintendo video game cartridges to another Taiwanese company known as Tri–Master, which in turn shipped such counterfeit cartridges to Las Vegas, Nevada. This shipment included counterfeit Nintendo video game cartridges incorporating up to 500 video games therein.

g). Defendants additionally sold great numbers of counterfeit Nintendo video game cartridges to a company in London, England, which in turn shipped these counterfeit Nintendo video game cartridges to New York, South Africa, and Los Angeles. One shipment included $6,000.00 worth of counterfeit Nintendo video game cartridges.

h). Defendants sold counterfeit Nintendo video game cartridges to a company known as AMC Enterprises, Inc., a California corporation. This corporation, and other individuals were the subject of a civil law suit brought by Nintendo for trademark and copyright infringement based on the sales of counterfeit Nintendo video games which resulted in a stipulated judgment in the amount of $110,000.00, which was paid by the Defendants in full.

26. In summary, Defendants knowingly and intentionally advertised, solicited sales and sold infringing Nintendo video game car-

tridges to its customers world wide, despite knowing a) that Nintendo was the copyright owner of many of the games contained in the counterfeit cartridges; b) that NTDEC was not authorized to do so by Nintendo; c) that the cartridges, or many of them, were counterfeit since they contained unauthorized direct copies of Nintendo's copyrights and trademarks; d) that their activities violated Nintendo's copyright and trademark rights; and, e) that their use of Nintendo trademarks would cause customer confusion. Further, Defendants' illegal domestic and extraterritorial activities had a direct impact on U.S. commerce by causing economic damage to Nintendo, a U.S. corporation.

27. In addition to the foregoing, the Court finds that Plaintiff's request for attorney fees and costs pursuant to 15 U.S.C. § 1117 and 17 U.S.C. § 505 is reasonable. Nintendo asserts that fees incurred by primary counsel in this case were $91,481.00 and that fees incurred by local counsel were $17,348.00. The Court having reviewed the Declaration of James Anable,[2] together with the summaries and actual time records of services rendered by counsel in this matter, finds that the hours expended on the litigation and the hourly rates charged are reasonable in light of the special skill and experience of counsel and the complexity of the case.

Nintendo also filed a Bill of Costs for a total of $709.80 which includes $120.00 for the United States District Court filing fee and $589.80 for a reporter at Uen Fu Wang's deposition. The Court finds that these costs are reasonable.

28. Any of the foregoing Findings of Fact that are conclusions of law shall constitute conclusions of law.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the causes of action herein pursuant to 17 U.S.C. § 501; 15 U.S.C. § 1121; and 28 U.S.C. §§ 1331, 1338.

2. The Defendants' activities as set forth in the foregoing Findings of Fact constitute copyright infringement pursuant to 17 U.S.C.

§§ 101, et seq. The Defendants have wrongfully infringed at least 28 separate Nintendo U.S. copyright registrations, and some or all of the copyright registrations so infringed are set forth in Paragraph 3 of the foregoing Findings of Fact.

3. The Defendants' activities as set forth in the foregoing Findings of Fact constitute trademark infringement pursuant to 15 U.S.C. § 1114(1). The Defendants have wrongfully infringed Nintendo's U.S. trademark registrations, and some or all of the trademark registrations so infringed are set forth in Paragraph 3 of the foregoing Findings of Fact.

4. The Defendants' activities as set forth in the foregoing Findings of Fact constitute false designation of origin pursuant to 15 U.S.C. § 1125(a).

5. The Defendants' activities as set forth in the foregoing Findings of Fact constitute violations of Arizona statutes and also constitute common law unfair competition.

■ 6. Pursuant to 15 U.S.C. § 1116 and 17 U.S.C. § 502, Nintendo is entitled to a worldwide permanent injunction to prevent the continued violation of its intellectual property rights.

7. The Defendants shall deliver to Nintendo any and all infringing goods for destruction pursuant to 15 U.S.C. § 1118 and 17 U.S.C. § 503.

8. Plaintiff is entitled to recover damages under 15 U.S.C. §§ 1114 et seq., as well as damages under 17 U.S.C. § 504, against all Defendants.

■ 9. Plaintiff is entitled to recover attorneys' fees and costs and prejudgment interest under 15 U.S.C. § 1117 and attorneys' fees and costs under 17 U.S.C. § 505. Calculation of the amount of attorney's fees properly awarded begins with the calculation of a "lodestar" amount, which is " 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.' " *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 562, 106

---

2. Mr. Anable is a partner in the firm of Christenson, O'Connor, Johnson & Kindness, and he specializes in the field of intellectual property law, including patent, trademark, and copyright litigation.

S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40); *Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir.1988). This lodestar amount is presumptively reasonable. *Jordan v. Multnomah County*, 815 F.2d 1258, 1262–63 (9th Cir.1987).

A District Court may adjust the lodestar figure based upon twelve factors listed in *Kerr v. Screen Extras Guild*, 526 F.2d 67, 69–70 (9th Cir.1975).[3] However, certain of the *Kerr* factors have been held to be subsumed in the lodestar calculation, and do not provide a basis for a subsequent adjustment. *Blum v. Stenson*, 465 U.S. 886, 888–890, 104 S.Ct. 1541, 1543–44, 79 L.Ed.2d 891 (1984); *Cunningham*, 879 F.2d at 484. Specifically, the subsumed factors are: the novelty and complexity of the issues; the special skill and experience of counsel, the quality of the representation, the results obtained and the superior performance of counsel. *Id.*

■ With these principals in mind, the Court concludes that Nintendo is entitled to an award of attorney fees in the amount of $108,829.00. Furthermore, the Court concludes that Nintendo's application for costs is also reasonable and awards Nintendo $709.80 as recoverable costs.

■ 10. Plaintiff has elected to seek statutory damages under 17 U.S.C. § 504(c) for the 28 registered copyrights infringed by Defendants. Plaintiff is entitled to recover the maximum statutory amount of $100,000.00 for each violation.

11. For trademark damages, Plaintiff is entitled to recover Defendants' profits in the amount of $6,374,997.00 and is entitled to have that amount trebled pursuant to 15 U.S.C. § 1117(b).

12. Prejudgment interest in the amount of 6.68% (annual interest rate established under Section 6621 of the Internal Revenue Code of 1954 as of 6/1/91) is applicable to said trebled amount under 15 U.S.C. § 1117(b). The interest shall commence from the time the lawsuit was served, on June 5, 1991.

13. For trademark damages, Plaintiff is further entitled to recover its net losses in the amount of $433,296.00.

14. Defendants are entitled to a credit for the amount paid to Plaintiff in restitution in the amount of $2,442.50.

15. Any of the foregoing Conclusions of Law that are Findings of Fact shall constitute Findings of Fact.

Based on the foregoing Findings of Fact and Conclusions of Law,

IT IS ORDERED that Plaintiff have and recover of Defendants, jointly and severally, the sum of $24,059,062.00, with interest accruing from the date of this Order at the federal rate. Plaintiff shall have and recover of Defendants, jointly and severally, an award of attorneys' fees in the amount of $108,829.00 and costs in the amount of $709.80.

IT IS FURTHER ORDERED that Defendants and their respective agents, servants, employees, successors and assigns, and all of those acting in concert or participation with them, be permanently enjoined and restrained from, either in the United States, or elsewhere in the world:

1. Using in any manner any of Nintendo's trademarks or any portion thereof, alone or in combination with any other mark which so resembles any of Nintendo's marks as to be likely to cause confusion, deception or mistake in connection with the manufacture, assembly, distribution, advertisement, promotion, offer for sale and/or sale of any product not manufactured, distributed, sponsored or sold by Nintendo;

2. Using in any manner any of Nintendo's works, characters or audio-visual materials which so resemble any of Nintendo's works

---

3. The twelve *Kerr* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the client; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr*, 526 F.2d at 70.

as to be likely to be a copy thereof in connection with the manufacture, assembly, distribution, advertisement, promotion, offer for sale and/or sale of any product not manufactured, distributed, sponsored or sold by Nintendo;

3. Using any of Nintendo's copyrighted video games or characters or any colorable imitations thereof in the manufacture, assembly, distribution, advertisement, promotion, offer for sale and/or sale of any goods or merchandise;

4. Passing off, inducing or enabling others to sell or pass off any product or item as a product or item produced by Nintendo, which is not Nintendo's or not produced under the control or supervision of Nintendo and approved by Nintendo for sale under any of Nintendo's marks and as Nintendo's works;

5. Falsely representing themselves as being connected with Nintendo or sponsored by or associated with Nintendo or engaging in any act that is likely to cause the trade, retailers or members of the purchasing public to believe that Defendants are associated with Nintendo or their activities are endorsed or approved by Nintendo;

6. Committing any acts calculated or likely to cause purchasers to believe falsely that goods sold by Defendants are sold under the control and supervision of Nintendo or are sponsored by, approved or connected with or guaranteed or produced under the control and supervision of Nintendo;

7. Using any logo, trade name or trademark which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of third parties are sponsored by, authorized by, or in any way associated with Nintendo;

8. Otherwise infringing Nintendo's trademarks or copyrights in Nintendo's works or otherwise unfairly competing with Nintendo in any manner; and

9. Shipping, delivering, distributing, moving, destroying, returning or otherwise disposing of in any manner, excepting delivery to Nintendo's counsel, any products or components or inventory thereof not manufactured by or for Nintendo, nor authorized by Nintendo to be sold or offered for sale, which

bear any of Nintendo's marks or embody any of Nintendo's works.

The Clerk is directed to enter judgment accordingly.

The Clerk is further directed to notify counsel for the respective parties of the making of this Order.