UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EASTERN ASSOCIATED COAL
CORPORATION,
Petitioner,

v.

OTTO WALKER; DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF
LABOR,
Respondents.

No. 95-2455

On Petition for Review of an Order
of the Benefits Review Board.
(94-2626-BLA, 93-2082-BLA)

Argued: May 10, 1996

Decided: August 12, 1996

Before WILKINSON, Chief Judge, and HALL and ERVIN,
Circuit Judges.

_____

Affirmed in part and vacated and remanded in part by unpublished
per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Mark Elliott Solomons, ARTER & HADDEN, Washing-
ton, D.C., for Petitioner. George P. Surmaitis, CRANDALL, PYLES
& HAVILAND, Charleston, West Virginia, for Respondents. **ON**

**BRIEF:** Laura Metcoff Klaus, ARTER & HADDEN, Washington, D.C., for Petitioner. Grant Crandall, CRANDALL, PYLES & HAVILAND, Charleston, West Virginia, for Respondents.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Eastern Associated Coal Corporation petitions for review of final orders of the Benefits Review Board affirming the Administrative Law Judge's Decision and Order awarding black lung disability benefits to Otto Walker, and affirming the ALJ's Supplemental Decision and Order granting attorney fees to Walker's legal counsel. We affirm the award of benefits, but we vacate the fee award and remand to the Department of Labor for the ALJ to further consider the appropriate compensation.

I.

A.

Walker filed this claim for benefits in 1983. In 1987, the matter came on for hearing before an ALJ, who denied the claim notwithstanding the opinion of Dr. Donald L. Rasmussen that, based on the results of a "single breath carbon monoxide diffusing capacity" (DLCO) test that he administered, Walker was afflicted with a moderate pulmonary impairment that precluded him from returning to his usual coal mine work.[1]

_____

[1] It is undisputed that Walker has pneumoconiosis, and that the disease arose out of his coal mine employment. See 20 C.F.R. §§ 718.202-03 (1996).

2

The ALJ declined to credit Dr. Rasmussen's report on the ground that the DLCO test was not specifically listed among the various criteria of 20 C.F.R. § 718.204(c), under which a miner's total disability may be established. The ALJ did not find (and Eastern did not contend) that Dr. Rasmussen had improperly administered the DLCO test to Walker, but instead concluded merely that the results of such a test are not relevant to evaluating whether a miner is disabled. The BRB affirmed.

On appeal, we vacated the denial of benefits. Walker v. Director, OWCP, 927 F.2d 181 (4th Cir. 1991) (Walker I ). In Walker I, we held that the criteria enumerated in § 718.204(c) are not an exhaustive list, and we noted Eastern's admission in its appellate brief that a valid DLCO test could, by itself, "carry the day for any [claimant]," as long as it was "properly reported and validated by a qualified physician." Id. at 184 (internal quotation marks and footnote omitted). We remanded the case for the Director to reconsider the denial of benefits in light of our admonition that the results of the DLCO test be weighed along with "all other relevant evidence." Id. at 185.

On remand, the parties were permitted to supplement the record with the submissions of Drs. Rasmussen and Ben V. Branscomb, who hold opposing views as to the utility of the DLCO test in accurately measuring pulmonary function.[2] The case was then assigned to a different ALJ, who, upon considering all of the evidence and argument theretofore submitted by the parties, entered a Decision and Order awarding benefits. The BRB affirmed, holding that the ALJ's findings and conclusions were rational, supported by substantial evidence, and consistent with the applicable law. Eastern now appeals.

B.

Eastern's argument on appeal vacillates effortlessly back and forth between questioning the scientific validity of DLCO tests in general,

_____

[2] Though Dr. Rasmussen stated that the DLCO test "certainly should be considered as valid evidence for assessment of impairment in coal miners," Dr. Branscomb opined that "[t]he diffusing capacity test result, by itself, is an extremely unreliable predictor for the presence of total disability."

3

and challenging the reliability of the particular test administered to Walker by Dr. Rasmussen.

The concepts of validity and reliability are ingrained within the scientific method. A test, measurement, or study is said to be scientifically "valid" to "the extent [that it] measures what it purports to measure." See, e.g., Dorland's Illustrated Medical Dictionary 1791 (28th ed. 1994). Such a test or measurement is "reliable" to the extent that it "gives the same results upon repeated sampling under identical conditions." Id. at 1444. In other words, a test's reliability reflects the accuracy of the raw data collected.

The validity of DLCO tests in general was, for the purposes of black lung litigation in this circuit, conclusively established in Walker I, wherein we held (and Eastern acknowledged) that such a test is indeed capable of "measuring what it purports to measure," i.e., the subject's pulmonary function. We noted only that the test results must be "properly reported and validated," id. at 184, meaning simply that the acts of recordation and attestation must comport with the generally accepted standards applicable to official medical reports. As we stated in Walker I, Dr. Rasmussen's recitation of the DLCO test results was properly reported and validated, and there can be no serious contention to the contrary. Indeed, the uncontradicted testimony of Dr. Rasmussen reveals that "[t]he testing performed on Mr. Walker corresponded to the methods prescribed by the American Thoracic Society in 1978."

Moreover, we think that Dr. Rasmussen's adherence to the ATS standards gives rise to a presumption that the DLCO test result obtained here is scientifically reliable, i.e. , that Walker's pulmonary efficiency is, in reality, only 59% of what would ordinarily be expected in a disease-free subject. There is no evidence in the record, including that outlining Dr. Branscomb's skeptical view of the utility of DLCO tests in general, that would have permitted the ALJ to conclude that the presumption of the test's reliability in this particular instance had been effectively rebutted.

C.

Our opinion in Walker I merely left open the possibility that, even giving Dr. Rasmussen's opinion the consideration that it deserved,

4

substantial evidence might nevertheless exist to support a denial of benefits. On remand, the ALJ perceived his duties precisely:

> [T]he Court's remand was unaccompanied by any mandate as to what further action need be taken in the instant case. . . . Nevertheless, it may be reasonably assumed that the Court meant for an ALJ to reconsider the case on the narrow issues delineated in the last sentence of its opinion, i.e., a weighing of the diffusing capacity test with the pulmonary function and blood gas studies and "all other relevant evidence[.]"

(emphasis deleted). As a result of considering the evidence anew, the ALJ concluded that Dr. Rasmussen's opinion, based on the single DLCO test, "carried the day" for Walker. The ALJ found that the test's revelation of what Dr. Rasmussen interpreted as a moderate impairment was consistent with the results of a pulmonary function study performed by Dr. John M. Daniel, who had been retained by Eastern to examine Walker in 1987. Blood gas studies conducted by Drs. Rasmussen and Daniel were inconclusive as a whole, inasmuch as Walker was unable to exert sufficient effort during the testing to produce a meaningful result.

The ALJ recited Dr. Rasmussen's belief that Walker's pulmonary impairment was due to his pneumoconiosis, and that it prevented him from returning to his usual coal mine work. As to this latter conclusion, the only evidence directly to the contrary was provided by Dr. Daniel, whose opinion as to Walker's disability was deemed to be without foundation in Walker I. Dr. Branscomb, as the ALJ noted, declined to offer an opinion on the matter.[3]

Based on the above, we believe that the ALJ's decision to award benefits is supported by substantial evidence and consistent with the law. We will not, therefore, disturb it.

_____

[3] Dr. Branscomb believed that the evidence was insufficient to allow him to form an opinion. He attributed this belief, at least in significant part, to his perception that the DLCO test is often an unreliable indicator of pulmonary function. See note 2, supra .

II.

Pursuant to the award of benefits, Walker's lawyer, Grant Crandall, submitted an application for attorney fees to the ALJ. See 20 C.F.R. §§ 725.366, -.367 (1996). The application requested recompense from Eastern at the rate of $200/hour for work performed by Mr. Crandall, and $150/hour for the services of his associate. The ALJ issued a Supplemental Decision and Order approving the application. The BRB affirmed, and Eastern appeals, asserting that the hourly rates are excessive.

Neither the ALJ nor the BRB mentioned the Supreme Court's decision in City of Burlington v. Dague, 505 U.S. 557 (1992). In Dague, the Court set forth guidelines for determining a"reasonable" hourly attorney fee under the various federal fee-shifting statutes.**4** According to the Court, the inquiry begins by calculating the"lodestar" figure, that is, the lawyer's usual hourly rate multiplied by the number of hours spent on a case. See id. at 562 ("We have established a `strong presumption' that the lodestar represents the `reasonable' fee. . . .") (citation omitted).

A fee in excess of the lodestar may be appropriate in a particular case, but only if the fee applicant can show that"such an adjustment is necessary to the determination of a reasonable fee." Id. (citation omitted). In no case may the lodestar figure be adjusted upward to reflect the risk that, in the event that the claimant or plaintiff does not prevail, the unsuccessful lawyer will recover nothing. Id. at 567.**5**

_____

**4** See, e.g., 20 C.F.R.§ 725.366(b) (1996) ("Any fee approved under paragraph (a) of this section shall be reasonably commensurate with the necessary work done. . . .").

**5** The Court has previously announced that factors such as the novelty and complexity of the issues, counsel's skill and experience, and the quality of the representation are presumed to be reflected in the lodestar amount, and would therefore result in impermissible double-counting if used as justification for increasing the basic fee award. See Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 564-65 (1986); Blum v. Stenson, 465 U.S. 886, 898-900 (1984).

We are unable to review the ALJ's fee award in this case, for there is no evidence of Mr. Crandall's usual hourly rate, or that of his associates. The record thus does not contain any indication of the appropriate lodestar figure, which the Supreme Court has deemed the necessary starting point for all analysis and review. The fee award must therefore be vacated, and the matter remanded for reconsideration.

III.

The award of benefits is affirmed, but the fee award is vacated and remanded to the Director for reconsideration in light of City of Burlington v. Dague.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

7